**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) | Court No. 26-00060 |
| Defendants, and | ) ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**OPPOSITION OF THE NEW ZEALAND GOVERNMENT TO THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760

wconnelly@tradepacificlaw.com

Date: March 9, 2026

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ........................................................................................................1

II.  FACTUAL BACKGROUND .......................................................................................2

    A.  The Court's August 2025 Opinion Concerning the 2024 Comparability Finding .........2

    B.  NMFS' Remand Decision Memorandum on the 2024 Comparability Finding .............3

    C.  Issuance of the 2025 Comparability Finding on August 26, 2025 ................................4

III.  ARGUMENT ...............................................................................................................7

    A.  Plaintiff Does Not Have Constitutional Standing to Bring This Action ........................7

    B.  Under Section 706(2)(A) of the Administrative Procedure Act, the Court Cannot Consider MHDD's PI Motion in the Absence of an Administrative Record ..............13

    C.  MHDD Has Failed to Demonstrate that the NZG's Fishing Restrictions and Monitoring Provisions Are Not Comparable in Effectiveness to U.S. Standards .......16

        1.  The Zero Mortality Rate Goal ...............................................................................18

        2.  The Negligible Impact Standard ............................................................................24

        3.  The Bycatch Limit .................................................................................................26

        4.  The NZG's Monitoring Program ...........................................................................29

        5.  The NZG's Population Estimate ............................................................................33

        6.  Māui Dolphin Bycatch ..........................................................................................36

        7.  The Hector's Dolphin Fisheries .............................................................................37

        8.  Bycatch of Hector's Dolphins ...............................................................................39

IV. CONCLUSION ............................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                          Page

*Dastech International Inc. v. United States International Trade Commission*,
963 F. Supp. 1220, (Ct. Int'l Trade 1997) ........................................................................14

*Defenders of Wildlife v. Hogarth*, 25 CIT 1309 (Ct. Int'l Trade 2001) ..........................14

*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ......................................7

*Gonzales v. West*, 218 F.3d 1378 (Fed. Cir. 2000) ...........................................................14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1991) ....................................................7,10

*Maui and Hector's Dolphin Defenders NZ Inc. v. National Marine Fisheries Service*,
799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ............................................................. *passim*

*Ninestar Corporation v. United States*, 666 F. Supp. 3d 1351(Ct. Int'l Trade 2023) ...................8

*Ninestar Corporation v. United States*, 687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) .................15

*Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) .. *passim*

*Sea Shepherd New Zealand, v. United States*, 693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) .........11

**Statutes**

5 U.S.C. § 706(1) .................................................................................................................2

5 U.S.C. § 706(2)(A) ..............................................................................................1, 13, 14

16 U.S.C. § 1362(20) ........................................................................................................26

16 U.S.C. § 1371(a)(5)(E)(1) ............................................................................................24

16 U.S.C. § 1387 ...............................................................................................................24

16 U.S.C. § 1387(d)(1) ......................................................................................................30

16 U.S.C. § 1387(d)(6)(B) ...................................................................................................9

16 U.S.C. § 1387(f) ....................................................................................................18, 28

**Regulations**                                                                 Page

50 C.F.R. § 216.3 ..........................................................................................................26

50 C.F.R. § 216.24 ........................................................................................................25

50 C.F.R. § 600.746 ..................................................................................................9, 32

**Federal Register Notices**

69 Fed. Reg. 43,338 (July 20, 2004) ............................................................................18

81 Fed. Reg. 54,398 (Aug. 15, 2016) ...........................................................................18

90 Fed. Reg. 42,395 (Sept. 2, 2025) ...............................................................................4

I.      **INTRODUCTION**

The New Zealand Government ("NZG") opposes the Māui and Hector's Dolphin

Defenders NZ Inc.'s ("MHDD") motion for preliminary injunction ("PI Motion") because the

Plaintiff has failed to demonstrate that the NZG's marine mammal-related fishing restrictions and

monitoring provisions, which apply to eleven inshore fisheries located around New Zealand's

North and South Islands, are not comparable in effectiveness to the standards in the Marine

Mammal Protection Act or its implementing regulations. However, this Court should not reach

the issue of whether MHDD has satisfied the criteria for a preliminary injunction because

MHDD has failed to demonstrate that it satisfies the Constitutional standing requirement.

Moreover, even if MHDD could meet the standing requirement, the jurisdictional statute

that applies here, 5 U.S.C. §706(2)(A), does not permit a court to issue a preliminary injunction

unless it has first received and reviewed the administrative record that supports an agency's

finding. The record that supports the 2025 Comparability Finding contains numerous sources of

evidence, including extensive science-based studies, that the National Marine Fisheries Service

("NMFS") relied upon. However, NMFS has not yet submitted the record supporting its 2025

Finding.

Without the required record, Section 706(2) review is not possible. Under this

circumstance and others that we describe below, the Court should hold the PI Motion in

abeyance and remand the matter to NMFS for preparation and submission of the record, along

with the submission of a Remand Decision Memorandum that contains a further explanation of

why the 2025 Finding satisfies the MMPA and implementing regulations as to the eleven

fisheries that MHDD has identified in its PI Motion. In the meantime, no import ban should be

imposed. This is the same procedure that this Court followed with respect to NMFS' 2024

Comparability Finding, and the circumstances are nearly identical with respect to the 2025 Finding.

## II.    FACTUAL BACKGROUND

### A.  The Court's August 2025 Opinion Concerning the 2024 Comparability Finding

On August 26, 2025, this Court issued its Opinion and Order in Court No. 24-00218, in which it held that NMFS' January 2024 Decision Memorandum, which supported its 2024 Comparability Finding, was arbitrary and capricious because it was a "cursory seven-page document that is replete with conclusory statements and cites minimal record evidence." *See Maui and Hector's Dolphin Defenders NZ Inc. v. National Marine Fisheries Service*, 799 F. Supp. 3d 1327, 1336 (Ct. Int'l Trade 2025) ("*MHDD I*"). The Court found that the Decision Memorandum failed to address, as it applied to Māui dolphins: (1) the MMPA's Zero Mortality Rate Goal; (2) the MMPA's "negligible impact" standard; (3) how the NZG calculated the "bycatch limit"; (4) the NZG's "Fishing Related Mortality Limit" and whether it was related to the bycatch limit; (5) how the NZG determined its most recent estimate of the Māui dolphin population; (6) whether the NZG's monitoring program was comparable in effectiveness to United States monitoring standards; (7) whether the NZG's regulatory programs were comparable in effectiveness to U.S. stock assessment standards; and (8) whether NMFS had evaluated whether the bycatch of other marine mammals exceeded U.S. standards. Due to these deficiencies, the Court vacated the Decision Memorandum and remanded it for "further consideration consistent with this Opinion." *MHDD I* at 1350.

However, the Court denied MHDD's request that it issue an import ban under the authority of 5 U.S.C. § 706(1) since that provision did not apply because NMFS had issued a positive comparability finding. *MHDD I* at 1349. However, the Court then cautioned that if the

agency "continues to rely on an arbitrary and unlawful Decision Memorandum that could be regarded as equivalent to denying a comparability finding," it might merit the implementation of an import ban going forward.  *Id.*

### B.  NMFS' Remand Decision Memorandum on the 2024 Comparability Finding

On January 2, 2026, NMFS issued a 67-page Remand Decision Memorandum that responded to the Court's remand order. Counsel for NMFS submitted this document under seal to the Court on January 6, 2026. ECF No. 58.[1] This document addresses each defect that the Court identified in the original 2024 Decision Memorandum concerning the West Coast North Island multi-species commercial set net and trawl fisheries.

On January 8, 2026, the Court entered a stay of all deadlines in Court No. 24-00218 until February 7, 2026. ECF No. 60. The Court then extended the stay until February 17, 2026. ECF No. 66.  Next, on February 20, 2026, the Court stayed NMFS' obligation to file its "Public Remand Comparability Findings" and the administrative record supporting those Findings. ECF No. 81. That stay remains in effect today. As a result, NMFS has not yet submitted the public version of the Remand Decision Memorandum. For that reason, the NZG is unable to refer to the detailed findings in that document which are directly relevant to each allegation in MHDD's PI Motion here.

MHDD implicitly concedes the relevance of the Remand Decision Memorandum to its challenges in this case when it states that, "The 2025 Comparability Finding for the West Coast North Island Fisheries repeats nearly all of the same errors that this Court identified in holding

---

[1] NMFS entitled this document "Remand Comparability Findings for New Zealand's West Coast North Island Multi-species Commercial Set Net and Trawl Fisheries – Decision Memorandum." NMFS filed the document under seal because it contained a limited amount of confidential information that the NZG provided concerning the extent of its monitoring activities.

the 2024 Comparability Finding for those fisheries arbitrary and contrary to law." PI Motion at 13. Assuming, but not conceding, that the same errors have been repeated in the 2025 Finding, this Court should again provide NMFS with the opportunity to address those alleged errors in a new Remand Decision Memorandum.

### C.  Issuance of the 2025 Comparability Finding on August 26, 2025

The NZG's 2024 Comparability Finding expired on September 2, 2025, when it was superseded and replaced with a new Comparability Finding to the NZG, as well as to 134 other nations for almost 2,500 fisheries. *See* 90 Fed. Reg. 42,395 (Sept. 2, 2025). Pursuant to this notice, the NMFS Assistant Minister of Fisheries sent a letter to the NZG's Minister for Oceans and Fisheries stating that NMFS had determined that the marine mammal protection measures employed in all of New Zealand's fisheries were comparable in effectiveness to U.S. standards.

The Appendix to this letter provided NMFS' "Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report." This Report is available at: https://www.fisheries.noaa.gov/s3/2025-08/New-Zealand-final-2025-508.pdf. The 2025 Finding is supported by NMFS' July 3, 2025 Decision Memorandum, captioned "Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings," which is available at: https://www.fisheries.noaa.gov/s3/2025-08/MMPA-Comparability-Findings-Decision-Memo-Signed-508.pdf.

Footnote 1 to the 2025 Finding states that:

NMFS's current determinations about New Zealand's Export and Exempt fisheries are based on an extensive record that is made up of, among other things, New Zealand's initial application and supporting materials, supplemental material provided to NMFS in response to past litigation, NMFS's 2020 and 2024 Comparability Findings and other readily available information.

The 2025 Finding then identifies many of the evidentiary materials that NMFS relied upon to support its conclusion that the NZG's marine mammal protection measures were comparable in effectiveness to U.S. standards. The cited materials include: (1) the NZG's Marine Mammals Protection Act 1978; (2) the NZG's Fisheries Act 1996; (3) the NZG's Fisheries (Reporting) Regulations 2017; (4) extensive information that the NZG provided to NMFS through the IAICRS database;[2] (5) the Fisheries (Commercial Fishing) Regulations and (Electronic Monitoring) Regulations; (6) the NZG's Hector's and Māui Dolphin Threat Management Plan 2020; (7) information that NMFS received during consultations with the NZG concerning its bycatch reduction program for Māui dolphins; (8) information that NMFS gathered during an on-site visit to the NZG's electronic monitoring center; (9) supplemental information that the NZG provided via email to inform its comparability finding application in response to NMFS

---

[2] The IAICRS (International Affairs Information Capture and Reporting System) is a system that NMFS operates to collect and manage information on protected species in international fisheries. The July 3, 2025 Decision Memorandum (at 6) provides an extended description of how NMFS uses this system to obtain information from harvesting nations:

> In particular, NMFS required that harvesting nations provide the following information for all of its fisheries on the LOFF, including but not limited to: (1) fishery target species; (2) gear types; (3) area of fishing operations; (4) existing fisheries; (5) lists of all marine mammals in the nations' waters and/or that overlap with its fisheries, including stock abundance estimates, recent and planned abundance survey dates and bycatch limits; (6) timing of the fishery(ies); (7) annual mortality rates of marine mammal interactions in fisheries that export fish and fish products to the United States; (8) marine mammal monitoring programs; (9) bycatch reduction measures; and (10) copies of relevant laws, decrees, and implementing regulations or measures related to commercial fisheries and marine mammal interactions. Harvesting nations submitted their 2019 Progress Reports through IAICRS, provided information about their fisheries for updated LOFF determinations, and submitted their applications for comparability findings through IAICRS in 2021.

Thus, the record upon which NMFS relied for its 2025 Finding contains all this information, which the NZG submitted through the IAICRS system.

questions; (10) the most recent "scientifically sound" abundance estimate for Māui dolphins issued in 2021; (11) information that the NZG provided concerning its monitoring program and monitoring levels through its IAICRS application and supplemental information; (12) the Fisheries (Geospatial Position Reporting) Regulations 2017; (13) provisions for updating abundance estimates, which are required to calculate the Potential Biological Removal ("PBR") level; (14) the NZG's description and domestic use of its population sustainability threshold ("PST") mechanism; (15) the NZG's description of the Māui Dolphin Habitat Zone; (16) the five-year research plan to improve the NZG's understanding of the nature and extent of threats to marine mammals; (17) the NZG's description of the extent of set net and trawl closure areas; (18) the Harbor and Coastal Setnet Operational Procedures for Protected Species Risk Management; (19) the voluntary Ten Golden Rules for Setnet Fishing to Save Protected Species; (20) the North Island Coastal Trawler Operational Procedures for Protected Species Risk Management, along with Ten Golden Rules for Coastal Trawling to Save Protected Species; (21) NMFS' 2017 Endangered Species Act Status Review for Hector's dolphins; (22) NMFS' 2024 five-year review for Māui and Hector's dolphins; (23) academic and scientific studies identified in footnotes 8-16 in the 2025 Finding; (24) results of passive acoustic monitoring systems to explore Māui dolphin distribution within and outside the core distribution area and in harbors; (25) the Atlantic Large Whale Take Reduction Plan; (26) the Spatially Explicit Fisheries Risk Assessment methodology used to estimate commercial fisheries risks to protected species; (27) reports of the International Whaling Commission's Scientific Committee meetings; and (28) the NZG's website that lists Hector's and Māui dolphin deaths, strandings, and bycatch incidents.

## III.    ARGUMENT

### A.  Plaintiff Does Not Have Constitutional Standing to Bring This Action

The standing component is an essential part of the case-or-controversy requirement of Article III of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1991). The "irreducible constitutional minimum" of standing consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Id.* at 560-61. At this stage of the proceeding, MHDD bears the burden of establishing these three elements with evidence, not with general allegations. *Id.* at 561.

When a lawsuit challenges the legality of government action or inaction, the nature and extent of the facts that must be established to satisfy the standing requirement "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Id.* Here, MHDD is not an "object of an action" or a "foregone action." Thus,

> [w]hen, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, *causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction* – and perhaps on the response of others as well. The existence of one or more of the essential elements of standing *"depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict"* . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but *it is ordinarily "substantially more difficult to establish."*

*Id.* at 562. (Emphasis added, internal citations omitted.) *See also Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025):

When the plaintiff is not the object of a government regulation, however, causation and redressability often depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief. See *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540. Courts must distinguish the "predictable" from the "speculative" effects of government action or judicial relief on third parties. *Ibid.*; see also *Department of Commerce v. New York*, 588 U.S. 752, 768, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019). With respect to causation (and redressability), a court must conclude that " 'third parties will likely react' " to the government regulation (or judicial relief) " 'in predictable ways' " that will likely cause (or redress) the plaintiff's injury. *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540 (quoting *California*, 593 U.S., at 675, 141 S.Ct. 2104).

We now demonstrate that MHDD has failed to establish that the response of the "regulated third party," i.e., the NZG, which in the words of the Supreme Court in *Lujan*, is a sovereign nation and, therefore, is an "independent actor[] . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict."[3]

In an effort to satisfy the redressability standard, MHDD has submitted Declarations from Moira Barber, Gemma McGrath, Christine Rose, and Glenn Simmons in support of its claim that a preliminary injunction and associated import ban on all seafood imports from all eleven fisheries is "likely" to cause the NZG to impose additional import restrictions including: (1) expansion of the ban on set nets and trawls to the 100-meter depth contour, as well as to at least 20 nautical miles around the entirety of both the North and South Islands; (2) a ban on set nets and trawls within the entirety of all North and South Island harbors; (3) installation of observers on all set net vessels less than 8 meters in length;[4] (4) installation of observers on all

---

[3] Questions of jurisdiction closely affect the question of whether a plaintiff is likely to succeed on the merits. Where there is no jurisdiction, then a plaintiff cannot succeed on the merits, and a preliminary injunction cannot issue. Moreover, a court must evaluate subject matter jurisdiction when ruling on a PI motion. *Ninestar Corporation v. United States*, 666 F. Supp. 3d 1351, 1359 (Ct. Int'l Trade 2023). In addition, a court may exercise its discretion to review the issue of jurisdiction before the preliminary injunction hearing where it has been fully briefed, as here. *Id.*

[4] MHDD appears to contend that the MMPA and implementing regulations prohibit the use of onboard cameras and instead requires the NZG to use onboard observers even though the MMPA

trawl vessels greater than 32 meters in length; and (5) achieve within five years the alleged Zero Mortality Rate Goal of the loss of no more than 1 Māui dolphin every 100 years to commercial fishing activity.

In short, MHDD asserts that an import ban would "likely" cause the NZG to adopt measures that would result, as a practical matter, in a shutdown of all set net and trawl fishing in all eleven fisheries. Therefore, to obtain a preliminary injunction, MHDD necessarily must provide evidence, not mere speculation, that the NZG is "likely" to adopt these measures, even though it fails to show that any of them are required by U.S. standards.

The attached Declaration of Emma Taylor rebuts the Declarants' "likelihood" contentions.  Ms. Taylor explains the following: (1) the statutory procedures that the NZG would need to employ to make any changes in its current marine mammal protection measures; (2) the nature of the information that the NZG would need to consider before making any changes; (3) the requirement that the NZG consult with all elements of the public, including Māori (New Zealand's indigenous people), before making any changes; (4) the requirement that New Zealand's Cabinet must give final approval to any revision to the NZG's current measures; (5) the length of time that it would likely take to complete all the processes required by law to make any changes to the current measures, including the drafting of regulations; (6) the fact that it took approximately two and one-half years for the NZG to complete all the procedures that were required before it implemented its October 1, 2020 measures; (7) when Judge Katzmann issued a preliminary injunction in *Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct.

---

provides a health and safety exception for the use of observers on vessels that are 8 meters or less in length. *See* 16 U.S.C. § 1387(d)(6)(B) and 50 C.F.R § 600.746. Moreover, MHDD appears to contend that the MMPA requires the NZG to employ observers on 100 percent of set net and trawl vessels for 100 percent of the fishing trips that they take in all eleven fisheries. *See* PI Motion at 19-21.

Int'l Trade 2022) ("*Sea Shepherd II*"), the NZG did not make any changes to its October 1, 2020 measures and instead developed a Certificate of Admissibility program that New Zealand's seafood industry could use to continue to export to the United States; (8) the NZG has no current plan to review its current measures in the absence of information that there is a sustainability risk to the populations; and (9) if an import ban were to be issued, New Zealand's seafood industry would be likely to continue to diversify its sales into third country markets.

This evidence makes clear that it is highly unlikely that an import ban would cause the NZG to redress the Declarants' alleged injury, and it certainly could not do so in a short period of time given the procedures that it must follow.

Nevertheless, each Declarant asserts that the NZG will respond to an import ban by imposing significant further restrictions on fishing, as well as by enhancing its monitoring requirements. The NZG does not question the sincerity of these Declarants with respect to their desire to enjoy the recreational, aesthetic, spiritual, artistic, cultural, commercial, scientific, and/or environmental benefits associated with observing Māui and Hector's dolphins. These goals are not enough under the law to demonstrate that their alleged injury is likely to be redressed by an import ban.

No Declarant offers any evidence, as opposed to mere speculation, that the NZG is likely to respond to an import ban in the manner that MHDD seeks. The Supreme Court held in *Lujan* that the courts "cannot presume either to control or predict" a sovereign nation's "exercise of broad and legitimate discretion." In fact, the NZG's response to the preliminary injunction that Judge Katzmann issued in *Sea Shepherd II* points in exactly the opposite direction of the import ban that MHDD seeks.

10

In *Sea Shepherd II*, the court granted an import ban on November 28, 2022 that enjoined imports of nine fish species that were caught in the West Coast North Island multi-species set net and trawl fisheries. 606 F. Supp. 3d at 1330-32. That injunction remained in place until the court dissolved it on April 1, 2024. *See Sea Shepherd New Zealand, v. United States*, 693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) ("*Sea Shepherd V*"). During that entire 17-month period, the NZG did not adopt any changes to the (enjoined) fishing restrictions or enhanced monitoring requirements as a result of the injunction. Instead, the NZG continued to defend its measures as comparable in effectiveness to U.S. standards by providing supplemental information in 2022 and 2023 to its comparability application. NMFS granted this application in its 2024 Comparability Finding, which is now the subject of MHDD's Complaint in Court No. 24-00218.

Instead of enacting additional measures in response to the preliminary injunction and associated import ban issued in *Sea Shepherd II*, the NZG developed and implemented a certification program that allowed exporters and importers of all seafood originating in New Zealand's fisheries to enter that seafood into U.S. customs territory by certifying that it was not one of the nine species whose importation had been banned and did not originate from either of the two fisheries subject to the ban. The Certification of Admissibility that the NZG developed is available at: US350_1 US certificate of admissibility.pdf.[5]

This option would be available once again if this Court entered an import ban, as would the option for New Zealand's seafood exporters to export to third countries any seafood caught in any of the eleven fisheries that might be covered by a preliminary injunction.

---

[5] The CBP's Cargo Systems Messaging Service bulletin announcing the requirement of a Certification Admissibility is available at: CSMS # 54456976 - Import Restrictions on Certain New Zealand Fish and Fish Products.

Fully aware of how the NZG and its exporters responded to Judge Katzmann's import ban, MHDD's four Declarants are compelled to speculate as to how the NZG is "likely" to respond to an import ban. For example, Declarant Barber states that, "If the United States were to impose an import ban, it would highlight the international significance of this issue and *would put intense pressure* on the New Zealand government to implement stronger protections to prevent Māui and Hector's dolphins and other marine mammals present in the fishing areas from getting entangled in the set nets and trawl nets of the fisheries." ECF No. 17-28 at para. 12. (Emphasis added.)

Similarly, Declarant McGrath states that, "If the United States were to impose an import ban, that action *would put pressure* on the New Zealand government to implement stronger protections to prevent Māui and Hector's dolphins and other marine mammals present in the fishing areas from getting entangled in set nets and trawl nets. At present, the policies, protection measures, and will for improvements are not strong enough, even in response to mounting bycatch evidence, alarm from expert scientists, and public pressure. *Trade and tariff pressures are very efficient means of negotiation* as has been demonstrated by the United States. Financial pressure on the fishing industry and in turn the New Zealand government may well be their much-needed catalyst for change." ECF No. 17-27 at para. 18. (Emphasis added.)

Declarant Rose states that, "As I have seen in the past, the NZ Government acts on dolphin protection when there is *irrefutable external pressure* to make them do so. A ban on imports *likely would incentivize the government of New Zealand* to take action to reduce Māui and Hector's dolphin bycatch and improve the regulatory program to meet U.S. standards in order for New Zealand fishers in Māui and Hector's habitat to regain access to U.S. markets. Such action could include implementing full electronic monitoring (as had been proposed) and,

more importantly, extending fisheries closures to more of the Māui dolphin and Hector's dolphin habitat, including harbours and to 20 nautical miles and the 100 meter depth contour as recommended by global scientists and for which we have been advocating for decades." ECF. No. 17-12 at para. 77. (Emphasis added.)

Declarant Simmons states that, "New Zealand is also likely to respond to a trade ban because of its acute sensitivity to reputational harm in key export markets. See id. ¶¶ 58–60. Extending the ban to include South Island fisheries *would substantially amplify that reputational pressure*." ECF No. 17-10 at para. 15. (Emphasis added.)

However, the same speculative "pressure" existed when Judge Katzmann imposed the import ban in *Sea Shepherd II*. And yet, the NZG did not adopt any additional measures during the 17-month period that the preliminary injunction remained in effect. Accordingly, it would strain the Supreme Court's use of the term "likely" beyond recognition for this Court to conclude that the very same speculative "pressure" would now cause the NZG to retreat from its firm conviction that its current measures are comparable in effectiveness to U.S. standards, as reflected in its applications for its 2024 and 2025 Comparability Findings.

### B. Under Section 706(2)(A) of the Administrative Procedure Act, the Court Cannot Consider MHDD's PI Motion in the Absence of an Administrative Record

It is well-established that U.S. government officials are presumed to have considered all record information before making their decisions and that they need not discuss all the evidence that they relied upon:

> [W]e hold that absent specific evidence indicating otherwise, all evidence contained in the record at the time of the RO's determination of the service connection must be presumed to have been reviewed by the Department of Veterans Affairs, and no further proof of such review is needed. *Cf. Clemmons v. West*, 206 F.3d 1401, 1403 (Fed.Cir.2000) ("Government officials are presumed to carry out their duties in good faith and proof to the contrary must be almost irrefragable to overcome that presumption."); *Medtronic, Inc. v. Daig Corp.*, 789

F.2d 903, 906 (Fed.Cir.1986) ("We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise."). Specifically, we reject the view that all evidence must be discussed.

*Gonzales v. West*, 218 F.3d 1378, 1381 (Fed. Cir. 2000). *See also Dastech International Inc. v.*

*United States International Trade Commission*, 963 F. Supp. 1220, 1226 (Ct. Int'l Trade 1997):

> The ITC is presumed to have considered all the evidence in the record. *Roses, Inc. v. United States,* 13 C.I.T. 662, 668, 720 F.Supp. 180, 185 (1989); *Granges Metallverken,* 13 CIT at 479, 716 F.Supp. at 24; *Nat'l Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 779, 696 F.Supp. 642, 648 (1988) (citations omitted). "[T]he fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties." *Granges Metallverken,* 13 CIT at 478–79, 716 F.Supp. at 24 (citations omitted). The ITC is not required to make written findings on all the factors it considers. *Negev Phosphates, Ltd. v. U.S. Dep't of Commerce,* 12 CIT 1074, 1083, 699 F.Supp. 938, 947 (1988) (citation omitted) (discussing a material injury determination). Furthermore, "the Court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id, citing Ceramica Regiomontana v. United States,* 810 F.2d 1137, 1139 (Fed.Cir.1987); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (applying the "arbitrary and capricious" standard).

However, without a record that includes all the information that the 2025 Finding was based upon, including the 28 types of information identified in Section II(C) above, the Court cannot apply the "arbitrary and capricious" standard of review in 5 U.S.C. § 702(2)(A). That provision states that, in making its determination, the reviewing court "*shall* review the whole record or those parts of it cited by a party." However, without a record, Section 706(2)(A) cannot be applied. *See, e.g., Defenders of Wildlife v. Hogarth*, 25 CIT 1309, 1315 (Ct. Int'l Trade 2001) ("The scope of review [under 5 U.S.C. § 706(2)(A)] is limited to the administrative record.") (Citations omitted.).

In addition, the 2025 Finding does not reflect NMFS' responses to the defects in the 2024 Comparability Finding that the Court identified in *MHDD I*. MHDD here asserts that "The 2025

Comparability Finding for the West Coast North Island Fisheries repeats nearly all of the same errors that this Court identified in holding the 2024 Comparability Finding for those fisheries arbitrary and contrary to law." PI Motion at 13. Of course, it was seemingly impossible for NMFS to address in its September 2, 2025 Comparability Finding the defects that this Court had identified a week earlier in its August 26, 2025 Opinion as to the 2024 Comparability Finding, especially given the burden that NMFS had undertaken to make fishery-specific comparability findings for about 2,500 fisheries by no later than September 1, 2025.

MHDD here raises the same initial challenges to the 2025 Comparability Finding that it raised in its initial challenge to the 2024 Comparability Finding with respect to the Māui dolphin, and it extends those same challenges to Hector's dolphins. However, without a record to rely upon in support of its 2025 Finding, NMFS is unable to fully support its position that the NZG has continued in 2025 and thereafter to maintain a regulatory program that is comparable in effectiveness to U.S. standards.

In short, in the context of the 2025 Finding, NMFS has never had the opportunity to respond to MHDD's nearly identical allegations as to Māui dolphins, much less to consider how the defects identified in *MHDD I* as to Māui dolphins bear upon its 2025 Finding for Hector's dolphins since those allegations are entirely new.

This is unfair, but the Court can remedy the unfairness in the way that the court directed in *Ninestar Corporation v. United States*, 687 F. Supp. 3d 1308, 1329 (Ct. Int'l Trade 2024):

> When the grounds for agency action are inadequate, "a court may remand for the agency to do one of two things: First, the agency can offer a fuller explanation of the agency's reasoning at the time of the agency action." (Citation omitted.) Importantly, "[w]hen an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate on that reason (or reasons)" but may not provide new ones." (Citation omitted.) Second, "the agency can 'deal with the problem afresh' by taking new agency action." (Citation omitted.)

15

As in *Ninestar*, the Court should remand with an instruction that NMFS elect one of these options. This is the same procedure that this Court used with respect to the 2024 Comparability Finding, and it is similarly appropriate here.

### C. MHDD Has Not Demonstrated that the NZG's Fishing Restrictions and Monitoring Provisions Are Not Comparable in Effectiveness to U.S. Standards

The PI Motion alleges a lack of comparability in effectiveness to those U.S. standards that apply to Māui dolphins and Hector's dolphins. Thus, despite the allegations and causes of action in its Complaint that pertain to other marine mammals, the PI Motion is limited to those two sub-species.[6] Despite the absence of the record that NMFS relied upon in preparing its 2025 Comparability Finding, the NZG nevertheless addresses, to the extent that it can, the challenges that MHDD has raised to that Finding.

Comparability findings are fishery-specific: "Comparability determinations are made on a fishery-by-fishery basis, not on a nation basis." July 3, 2025 Decision Memorandum at 1. However, except for the two North Island fisheries, MHDD's PI Motion does not address on a fishery-by-fishery basis any of the nine fisheries that they allege pose a bycatch risk to Hector's dolphins. For this reason alone, this Court should not grant a preliminary injunction on any of these nine fisheries.

MHDD does briefly discuss the South Island fisheries as a whole and alleges that "NMFS failed to evaluate whether the South Island Fisheries meet these [U.S.] standards with regard to Hector's dolphin bycatch." PI Motion at 26. That statement is wrong, as the record would demonstrate. And, with one exception relating to the calculation of Hector's dolphin bycatch

---

[6] MHDD acknowledges that Māui dolphins are only found inshore around the West Coast North Island in fishery ID nos. 1969 and 1977. MHDD's allegations re Hector's dolphins concern fishery ID nos. 1883, 1978, 2041, 2046, 2047, 2051, 2052, 2067, and 2077, most, but not all, of which are located around the South Island. *See* PI Motion at 12.

(which is erroneous), MHDD does not specify how the NZG's measures in any of the nine fisheries fail to satisfy the Zero Mortality Rate Goal or the negligible impact standard. Also, MHDD does not describe abundance estimates or the PBRs for Hector's dolphins, and it does not characterize any of the nine fisheries and the purported fishing risks that any of those fisheries poses to Hector's dolphins relative to the PBR. Moreover, its allegation that the PBRs for Hector's dolphins have been exceeded relies on demonstrably outdated or erroneous information.[7] In addition, MHDD fails to identify the monitoring provisions applicable to any of the nine fisheries even though the applicable monitoring provisions are widely available from public sources. Finally, it does not discuss how the NZG's Threat Management Plan addresses the risks posed by set nets or trawls to certain Hector's dolphin populations.

Thus, these allegations are deficient under the required "fishery-by-fishery" analysis of whether measures comparable in effectiveness to U.S. standards have been employed. Moreover, if given the opportunity by the Court, upon remand NMFS could submit all the information that

---

[7] The Slooten Declaration does address Hector's dolphins but is replete with analytical errors that render its conclusions unreliable, if not entirely unfounded. For example, Ms. Slooten: (1) makes assertions as to the historical Hector's dolphin population size, but there is no accepted historical population size; (2) relies on a highly uncertain population estimate for the North Coast South Island that is based on a single observation from a 2013 winter aerial survey to derive a PBR; (3) ignores the fact that the NZG's October 1, 2020 and subsequent 2022 measures have reduced bycatch to a level that will allow the population to recover to the objectives established in the TMP; (4) relies on population estimates and PBRs that are erroneous for Otago and Kaikura; (5) relies on a single year of bycatch observations even though the U.S. standard requires data for a five-year period before any conclusions can be drawn; (6) grossly exaggerates the risk posed by the use of set nets in harbors; (7) misstates the extent to which the NZG's monitoring program applies to "in-scope" vessels; (8) wrongly insists that U.S. standards governing monitoring require the use of human observers; (9) relies on bycatch estimates from before the October 1, 2020 fisheries measures were implemented; and (10) incorrectly summarizes the fishery measures now in effect.

However, without a record to rely on for a rebuttal, NMFS and the NZG are unable to respond to the required extent to each of Ms. Slooten's contentions. This is yet another reason why the Court should allow NMFS to issue a Remand Decision Memorandum

the NZG provided upon which NMFS relied in making fishery-by-fishery determinations for Hector's dolphins in the 2025 Finding.

We now demonstrate that MHDD is unlikely to prevail on the merits of any of its eight claims that the 2025 Finding erroneously finds the NZG's measures are not comparable in effectiveness to U.S. standards.

### 1. The Zero Mortality Rate Goal

MHDD asserts that the 2025 Finding fails to address the MMPA's Zero Mortality Rate Goal ("ZMRG").  PI Motion at 14-16. However, neither the MMPA nor the implementing regulations require a harvesting nation to demonstrate that it has adopted an express goal to "reduce the rate of incidental mortality or serious injury to insignificant levels approaching a zero mortality and serious injury rate." Instead, the preamble to the implementing regulations states that:

> NMFS is not ignoring the ZMRG standard in the rule; it has prioritized reducing bycatch to sustainable levels (e.g. below the bycatch limit) and will consider the application of the ZMRG, or metrics/measures comparable in effectiveness to ZMRG, to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met ZMRG.

81 Fed. Reg. 54,398 (Aug. 15, 2016) (Response to Comment 20). Thus, the U.S. standard is a program that prioritizes reducing bycatch to sustainable levels, i.e., to "below the bycatch limit." One example of the "flexibility" that NMFS affords to U.S. fisheries to achieve this priority is described in Section 118(f) of the MMPA, 16 U.S.C. § 1387(f), captioned "Take Reduction Plans." *See also* 69 Fed. Reg. 43,338, 43,340 (July 20, 2004) (NMFS Response to Comment 15):

> MMPA section 118(b)(4) requires, where incidental mortality and serious injury exceed this level, NMFS to take appropriate action under MMPA section 118(f), which describes the development and implementation of TRPs. . . . Thus, the ZMRG threshold is not defined in such a manner to shut-down or significantly curtail the activities of commercial fishing simply because a fishery exceeds the threshold.

The July 3, 2025 Decision Memorandum (at 11-12) contains an extended discussion of how commercial fisheries should "approach" the ZMRG. This approach includes the convening of Take Reduction Teams and the development of Take Reduction Plans that can include "a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks," and these measures can include time/area closures and gear modifications. *Id.* at 11. Thus, the issue is whether the record of the 2025 Finding identifies the measures that the NZG has adopted that are designed to achieve comparability in effectiveness with the ZMRG.

In this regard, no U.S. standard requires a harvesting nation to have a single law, regulation, or policy that establishes the ZMRG. Instead, the MMPA permits as a standard a collection of measures that are comparable in effectiveness to the ZMRG. Accordingly, the NZG satisfies the ZMRG because it maintains a comprehensive regulatory system for managing marine mammal interactions with commercial fishing activities. This system includes, but is not limited to, the following measures and information, which are found in the record of 2025 Finding, as well as referenced in the Finding itself:

(a) the Fisheries Act 1996, which the NZG considered to be the most appropriate legislative tool with which to manage fishing-related risks because of its focus on monitoring and managing fishing activities and their impacts. Section 8 requires the NZG to avoid, remedy, or mitigate any adverse effects of fishing on the aquatic environment. Section 9 states that, "All persons exercising or performing functions, duties, or powers under this Act, in relation to the utilisation of fisheries resources or ensuring sustainability, shall take into account the following environmental principles: (a) associated or dependent species should be maintained above a level that ensures their

long-term viability; (b) biological diversity of the aquatic environment should be maintained; and (c) habitat of particular significance for fisheries management should be protected." Section 11 provides broad discretion to enact sustainability measures that may relate to catch limits, the areas from which any fish may be taken, and the fishing methods that may be used. Section 15 requires the NZG to take such measures as are considered necessary to avoid, remedy, or mitigate any adverse effects of fishing-related mortality on any protected species, which may include the setting of a fishing-related mortality limit.

(b) The Marine Mammals Protection Act 1978, which requires that, if a population management plan has been approved for any threatened species, the NZG shall establish a fishing-related mortality limit that allows the species to achieve non-threatened status as soon as reasonably practicable and, in any event, within a period not exceeding 20 years. Although no population management plans are in place in New Zealand, fishing related mortality limits have been established under Section 15 of the Fisheries Act 1996.

(c) The NZG's 2020 Threat Management Plan for Māui and Hector's dolphins. Relevant aspects of the TMP include the following:

- The NZG's long-term goal is to ensure that Māui and Hector's dolphin subpopulations are thriving and increasing, backed by an enduring, cohesive, and effective threat management program.

- One of the medium-term goals is to ensure that known human-induced threats are managed within levels that allow subpopulations to thrive and recover.

- The "population outcome" for the Māui dolphin is to manage human impacts to allow the population to increase to a level at or above 95% of the maximum

number of dolphins the environment can support. A population outcome of 95% means that human-induced threats need to be as near as practicable to zero.

- The "population outcome" for the Hector's dolphin is to manage human impacts to allow the population to increase to a level at or above 90% of the maximum number of dolphins that the environment can support. Since the Hector's dolphin population is much larger than the Māui dolphin population, the acceptable level of human impact can be higher while still allowing the population to increase to a very high proportion of the maximum number of dolphins the environment can sustain.

- Fisheries management objectives are intended to ensure that dolphin deaths arising from fisheries threats do not: exceed the maximum number of human-induced threats that could occur to achieve the applicable population outcome with 95% certainty: cause localized depletion; and create substantial barriers to dispersal or connectivity between subpopulations.

- In addition, fisheries are to be managed in a way to allow localized Hector's dolphin populations to recover to and/or remain at or above 80% of their unimpacted status (i.e., if fishing was not occurring) with 95% certainty.

- The TMP lists the "fishing protection measures" for both the North and South Island for set nets and trawls, which are "spatial closures [that] are the principal mechanisms to reduce the risk of bycatch."

- A "fishing related mortality limit" applies to both recreational and commercial fishermen.  This limit is one individual dolphin within the defined Māui dolphin

habitat zone. Additional fishing-related mortality limits for South Island Hector's dolphin populations were implemented in 2022.

- Regulations requiring the use of onboard cameras for certain commercial fishing vessels are referenced.

These laws and objectives, along with the 2025 Finding's recitation of the NZG's calculation of the bycatch limit, as well as its extensive description of the fishing prohibitions, leave no doubt that NMFS considered how the NZG intended to implement a program comparable in effectiveness to the ZMRG. Moreover, the ZMRG is just that -- a "goal," and MHDD has not shown that the NZG has failed to establish a comprehensive program to achieve an outcome comparable in effectiveness to that goal. In addition, NMFS has never closed a U.S. fishery for failure to meet its ZMRG.

The remaining aspect of MHDD's ZMRG claim is whether the NZG has taken the steps necessary to progress towards achieving the "goal" of zero mortality. As explained above, zero mortality is not the U.S. standard under the MMPA. Rather, fisheries must be *progressing* towards that goal. There has not been a documented instance of a fishing-related death or serious injury of a Māui or Hector's dolphin off the West Coast North Island since 2012. Thus, there has been a "zero mortality" rate and a zero "serious injury" rate" for the past 13 years.

Considering all this information, the first defect in MHDD's ZMRG challenge is that it wrongly insists that the NZG's laws, regulations, and policies are required to contain the precise words "zero mortality rate goal." MHDD thereby fails to acknowledge that a harvesting nation can adopt a program that is comparable in effectiveness to the ZMRG through the use of processes and measures that achieve similar results, including convening a Take Reduction Team to develop a Take Reduction Plan, or some other comparable mechanism.

Second, MHDD insists that the NZG has literally not achieved the ZMRG for Māui dolphins, but even if correct (which the NZG disputes), that contention does not end the matter. Rather, the question is whether, taken as a whole, the 2025 Finding and its supporting record contain the information that addresses the steps that the NZG has taken that are necessary to achieve a goal that is comparable in effectiveness to the ZMRG.[8]

The third defect in MHDD's ZMRG claim is that it has not discussed whether any of the information that the 2025 Finding relies upon addresses whether the NZG maintains a standard that is comparable in effectiveness to the ZMRG, much less what the NZG might do if its bycatch exceeded 10% of the PBR level. As noted above, the MMPA and implementing regulations do not require a foreign government to implement a ZMRG, only something comparable in effectiveness. Accordingly, MHDD's contention fails because it does not address whether the NZG has adopted a comparable standard, such as the standards embodied in its Threat Management Plan, upon which the 2025 Finding expressly relies.

The 2025 Finding (at 23-24) identifies those standards as follows:

> Along with the creation of the Māui Dolphin Habitat Zone (MDHZ) discussed in question 2b, New Zealand created and implemented its Hector's and Māui Dolphin Threat Management Plan (TMP) 2020. The TMP provides clear objectives to ensure that government agencies are operating collectively to achieve common goals and provides specific details to assist the Minister for Ocean and Fisheries and the Minister of Conservation in making conservation decisions. Some of the TMP objectives are: ensure that dolphin deaths arising from fisheries threats do not exceed the population sustainability threshold (PST) with 95% certainty, cause localized depletion, create substantial barriers to dispersal between subpopulations, and allow localized subpopulations to recover and/or remain at or above 80% of their un-impacted status with 95% certainty.

---

[8] The House Conference Report that accompanied the original inclusion of ZMRG stated that "the objective of regulation would be to approach as closely as is feasible the goal of zero mortality and injury to marine mammals . . . [i]t may never be possible to achieve this goal, human fallibility being what it is, but the objective remains clear." H.R. Conf. Rep. No. 92-1488.

In addition, as noted above, the 2025 Finding relies, among other things, on the Fisheries Act 1996, gear requirements, extensive closure areas, the Fishing Related Mortality Limit, and management triggers, all of which, taken collectively, are comparable to the ZMRG.

Finally, MHDD asserts that the "2025 Comparability Finding estimates total mortality and injury of Māui dolphins in New Zealand fisheries is 0.10, or 1 dolphin every 10 years." PI Motion at 16. This is incorrect because the 0.10 figure is the *bycatch limit*, i.e., the PBR level. It is not an estimate of *actual bycatch*. The NZG has estimated bycatch as 0.056 individuals. *See* 2025 Finding at 28. This figure is equivalent to one Māui dolphin death every 17.8 years, which is a rate that undeniably approaches the ZMRG.

### 2. The Negligible Impact Standard

The negligible impact standard is a concept seemingly unique to the MMPA's permitting scheme, and it is, therefore, irrelevant to the issue of whether the NZG's measures are comparable in effectiveness to U.S. standards, as a plain reading of the text of that provision in 16 U.S.C. § 1371(a)(5)(E)(1) demonstrates. Specifically, when a depleted marine mammal species or stock is potentially affected by a commercial fishery, the MMPA provides that NMFS *shall allow* the incidental taking of such species or stock if the incidental mortality or serious injury from commercial fisheries will have: (i) a negligible impact on such species or stock; (ii) a recovery plan has been developed or is being developed for that species or stock; and, (iii) where it is required under Section 1387 of the MMPA, a monitoring program has been established, vessels engaged in the fisheries are registered, and a take reduction plan has been developed or is being developed for the species or stock.

Thus, the grant of a permit is *mandatory* if the three statutory criteria are met. In other words, the law affirmatively requires the issuance of permits for the incidental take of a depleted

species or stock under specified circumstances but only after NMFS first provides notice and an opportunity for public comment.

However, the NZG does not maintain anything that remotely resembles the MMPA's incidental take permitting process. *The NZG cannot issue, and has never issued, a permit that would allow an incidental taking.* Nor does the NZG provide for notice and an opportunity for public comment. Thus, as both a legal and practical matter, the negligible impact standard does not apply to the Māui dolphin.

For this reason, MHDD's claim that the 2025 Finding does not address the negligible impact standard is irrelevant. Moreover, the implementing regulations in 50 C.F.R. § 216.24 do not establish the MMPA's negligible impact provision as a standard for foreign fisheries. That is why the July 3, 2025 Decision Memorandum's discussion (at 17) of the negligible impact standard states that:

> There is no requirement that harvesting nations maintain the exact same regulatory scheme as prescribed under the MMPA, *section 101(a)(5)(E) included*. NMFS's focus was on whether the harvesting nation's strategy, including its management measures, was ultimately comparable in effectiveness to the U.S. regulatory program, including in those cases where ESA-listed stocks/species were affected.

(Emphasis added.) And, in any event, the fact that New Zealand law does not permit the NZG to issue permits that authorize an incidental taking during the course of commercial fishing constitutes a measure comparable in effectiveness to the MMPA's negligible impact standard.

Nevertheless, in *MHDD I*, this Court held that the NZG "does not cite to any law prohibiting incidental taking and actually reported in its comparability application that it did not prohibit the incidental bycatch of marine mammals." 799 F. Supp. 3d at 1339. However, the 2025 Finding did not need to address the negligible impact standard because it was irrelevant.

Moreover, in *MHDD I*, the Court did not address the relevance of the NZG's assertion that the incidental bycatch of just one Māui dolphin would cause the negligible impact standard to be exceeded assuming that it even applied. That fact further establishes that NZG law prohibits authorization of the incidental bycatch of a marine mammal. Nor did the Court evaluate whether the entirety of the NZG's fishing restrictions and monitoring measures ensured that fishing-related impacts would be limited to low enough levels to achieve the same objective as the negligible impact standard. And, finally, even if that standard was exceeded, which it has not, the MMPA would not require the closure of a U.S. fishery or a corresponding import ban on products from a foreign fishery if the negligible impact standard had been exceeded.

### 3. The Bycatch Limit

MHDD asserts that NMFS erred when it found that the NZG had implemented a "bycatch limit" that is comparable in effectiveness to U.S. standards. PI Motion at 16-19. The "bycatch limit" is the same as the Potential Biological Removal Level ("PBR"). 50 C.F.R. §216.3 provides as follows:

> *Bycatch limit* means the calculation of a potential biological removal level for a particular marine mammal stock, as defined in <u>§ 229.2 of this chapter</u>, or comparable scientific metric established by the harvesting nation or applicable regional fishery management organization or intergovernmental agreement.

 The 2025 Finding (at 22-23) contains an extended discussion of how PBR is to be calculated, and the formula appears in 16 U.S.C. § 1362(20). Specifically, the 2025 Finding explains that "the MMPA requires a calculation of PBR for all marine mammal stocks." It then explains what PBR represents and how it is determined, including the use of an abundance estimate in the PBR formula. It expressly references the NMFS Guidelines for Preparing Stock Assessment Reports (SARs), which contain detailed guidance as to how PBR should be calculated. Then, the 2025 Finding provides (at 28) its calculation of the PBR as 0.10. This bycatch limit means that just

one dolphin can be killed or seriously injured during commercial fishing activities every 10 years in order for the stock to reach or maintain its optimum sustainable population.

MHDD does not challenge this calculation as incorrect, nor could it be wrong since the NZG has applied the formula prescribed by law. Nor does MHDD assert that the 2025 Finding used the wrong PBR at any point. MHDD also does not assert that NZG failed to use this statutory formula or applied the wrong inputs into the formula, which yielded the PBR of 0.10 (rounded by NMFS from 0.102). Accordingly, the NZG doesn't maintain just a comparably effective standard to the PBR. Rather, it maintains the exact same standard required under the MMPA.

Moreover, even if a PBR is exceeded in a U.S. fishery, NMFS does not close that fishery, as the 2025 Finding states (at 23):

> If the PBR is exceeded, 16 U.S.C. § 1387 does not mandate a closure of a fishery. Typically, when PBR is exceeded, NMFS will reconvene the Take Reduction Team to explore whether additional regulatory measures exist to further reduce bycatch below PBR again. In the past and at present, NMFS has not closed a fishery under this regulatory review process when bycatch of a marine mammal stock exceeds PBR.

Accordingly, even if one Māui dolphin died in a set net, an import ban, which is the foreign fishery equivalent of the closure of a domestic fishery, would not be comparable in effectiveness to U.S. standards, which do not require a fishery's closure if PBR is exceeded.

Since there can be no doubt that the NZG correctly calculated the 0.10 bycatch limit, which NMFS then affirmed in the 2025 finding, the Court should reject MHDD's effort to conflate the PBR calculation with entirely different concepts. First, MHDD states the 2025 Finding did not address how "New Zealand calculated a bycatch limit of one dolphin." PI Motion at 17. But, the 2025 Finding states that the NZG's bycatch limit is 0.10, not 1.00, so this

assertion is irrelevant. However, if one Māui dolphin were to be caught in a set net or trawl, the NZG must take action. This requirement is, yet again, different from the MMPA's bycatch limit.

Second, MHDD asserts that the 2025 finding did not address the NZG's Fishing Related Mortality Limit ("FRML"), but this is an NZG management tool that provides the Minister for Oceans and Fisheries with the authority to manage fisheries risk to a level below the PBR, e.g., by implementing additional fishery closures. PI Motion at 16-18. It is not a bycatch limit required by the MMPA, so it is equally irrelevant to the issue of comparability in effectiveness compared to the U.S. bycatch standard.

Third, MHDD asserts that the 2025 Finding neglected to identify any record evidence to support its determination of bycatch. PI Motion at 19. However, Table 3 (at 28) in the 2025 Finding contains that evidence. Moreover, the extent of *actual bycatch* is entirely different from the *bycatch limit* and, therefore, is also irrelevant to calculation of the bycatch limit.

Fourth, MHDD asserts that New Zealand's laws and regulations do not contain the bycatch limit of 0.102 individuals. PI Motion at 19.  However, U.S. standards do not require the NZG's law to include a reference to the PBR or any comparable metric, nor does MHDD assert to the contrary. Moreover, if one Māui dolphin is caught during any commercial or recreational fishing activity, the NZG must take action. This requirement, here again, is different from the MMPA's bycatch limit.

Finally, MHDD asserts that "NMFS did not explain or identify any measures that would need to be implemented" if the 0.10 limit were exceeded. PI Motion at 19. However, the MMPA does not mandate any specific measures to be implemented if the PBR level is exceeded in a domestic fishery. Rather, the specific measures are left to the discretion of the Take Reduction Team and the Take Reduction Plan under 16 U.S.C § 1387(f). Similarly, New Zealand's law

provides discretion to the NZG in deciding which measures should be adopted if PBR is exceeded. *See* 2025 Finding at 25.

### 4. The NZG's Monitoring Program

MHDD asserts that the 2025 Finding "repeats each of [the] errors" that the Court found in *MHDD I*, namely that: (1) NMFS did not explain why its monitoring standard was 10% observer coverage; (2) NMFS "arbitrarily" assumed that the NZG's monitoring program covered 90% of fishing activity in the MDHZ, but did not address allegedly contrary evidence; and (3) NMFS did not identify any evidence that U.S. standards authorized the use of electronic monitoring, as opposed to human observers, or that electronic monitoring was as effective as observers. PI Motion at 20-21. The July 3, 2025 Decision Memorandum and the 2025 Finding (at 3-4, 17-21), address each of these issues.

The Decision Memorandum (at 12) explains the types of monitoring that satisfy U.S. standards:

> TRPs may also recommend specific levels of monitoring for a fishery to account for any incidental mortality and serious injury of marine mammals during the course of commercial fishing operations. See id. at §§ 1387(d)(1) & (f)(9). Examples of monitoring methods include at-sea monitoring through observers, *electronic monitoring using onboard video cameras*, and self-reporting of any incidental mortality and injury of marine mammals. See id. at §§ 1387(d) & (e). Observers and *electronic monitoring systems* collect data on the catch and discards caught by U.S. commercial fishing vessels and document bycatch of marine mammals.

(Emphasis added.) This statement removes all doubt that the NZG's use of electronic monitoring is comparable in effectiveness to U.S. standards.

Next, contrary to MHDD's claim, the 2025 Finding did not conclude that the NZG's monitoring program was comparable to U.S. standards because it exceeded 10% observer coverage. Rather, the statute requires that a monitoring program obtain "statistically reliable

estimates" of incidental mortality and serious injury of marine mammals, although the statute does not define this term. 16 U.S.C. § 1387(d)(1).[9] NMFS then explained that the comparability of monitoring coverage is determined on a fishery-by-fishery basis. Thus, there is no "definitive metric" for determining monitoring comparability. Moreover, nothing in the statute mandates the use of human observers. Rather, the statute says that observers "may" be used.

Contrary to MHDD's assertion, U.S. standards do not require 100% monitoring coverage "when monitoring data are needed to estimate protected species bycatch, make in-season management decisions, close fisheries when bycatch limits are exceeded or ensure regulatory compliance." PI Motion at 20. Rather, the 2025 Finding states (at 18) that, "For PBRs that are less than 1, observer coverage of greater than 80% would be required only if the monitoring program was expected to last for one year." Of course, the NZG's monitoring program has been in effect for many years and has been expanded in scale through the rollout of electronic monitoring, so the 80% standard is not required for a comparability finding. Moreover, U.S. standards allow monitoring coverage to decrease as the monitoring program spans additional years.

The 2025 Finding describes at length the NZG's monitoring program, which it summarizes (at 18-19) as follows:

> New Zealand's monitoring program is required under its Marine Mammal Protection Act 1978, the Fisheries (Reporting) Regulations 2017, and the Fisheries (Electronic Monitoring) Regulation 2017 amended in 2022. The amendment to the Fisheries (Electronic Monitoring) Regulation 2017 from 2022 outlines the scope and coverage of the electronic monitoring program. In addition to the fishing restrictions and observer monitoring as outlined for all of New Zealand's fisheries, New Zealand expanded EM coverage along the entire coast of the North Island west coast, and the video camera monitoring area now includes the entirety of the Māui Dolphin Habitat Zone (MDHZ): from the northern extent

---

[9] The NZG also provided evidence of statistical reliability in submissions that NMFS referenced in footnote 1 of the 2025 Finding.

of Cape Reinga down to the end of the southern extent at Wellington. These EM expansions focused on the areas outside of the core Māui dolphin distribution area where the greatest residual risk for Māui dolphin bycatch remained prior to the expansion. The MDHZ is located on the west coast of the North Island (including harbors) from the coast out to 12nm. The MDHZ covers approximately 90-95% of Māui dolphin habitat over its entire distribution.

New Zealand's monitoring program consists of logbooks (self-reporting) and at-sea monitoring. At-sea monitoring consists of both EM through on-board video cameras and observers. The amount of monitoring listed in New Zealand's IAICRS application pertains to the entire set net and inshore trawl fleets. See Table 1 below for New Zealand's monitoring program both by the entire set net and inshore trawl fleets and for within the MDHZ for each fishery

This summary is followed by a lengthy description of how the NZG's monitoring program is comparable in effectiveness to U.S. standards. For example, the 2025 Finding states that the NZG has expanded its electronic monitoring coverage since 2023 to now include "the entire coast of the North Island west coast," as well as "the entirety of the Māui Dolphin Habitat Zone." This expansion focused on the areas outside of the core Māui dolphin distribution area "where the greatest residual risk for Māui dolphin bycatch remained prior to the [electronic monitoring program] expansion."

The 2025 Finding (at 19) also lists the extent of monitoring coverage for Fishery ID Nos. 1969 (WCNI set net fleet) and 1977 (WCNI trawl fleet). It further explains (at 20) that the electronic monitoring program has been expanded to include 100% monitoring for all inshore trawl vessels in the MDHZ and 100% monitoring on all coastal set net vessels north of Whanganui.

It is unnecessary to repeat any more of the 2025 Finding's extremely detailed description of every element of the NZG's monitoring program to conclude that it is comparable in effectiveness to U.S. standards. For that reason, MHDD is unable to identify any U.S. fishery where NMFS has required monitoring levels that exceed the levels implemented by the NZG.

Nevertheless, MHDD disagrees with NMFS' conclusions that the monitoring program is sufficient, but that disagreement does not provide a basis for concluding that the NZG fails to maintain a program that is comparable in effectiveness to U.S. standards. Moreover, the 2025 Finding's discussion of the monitoring program fully responds to the Court's finding in *MHDD I* that the Decision Memorandum "never addressed the United States monitoring standards that NMFS determined were exceeded by New Zealand's monitoring program. The Decision Memorandum merely expressed a conclusion . . . ." 779 F. Supp. 3d at 1344.

MHDD also ignores essential elements of the NZG's monitoring program. Specifically, MHDD ignores the fact that all fishing vessels must be registered, and commercial fishers must provide a fish catch report and a non-fish or protected species report (including marine mammals) together on the same or following day that the fishing event occurred. The positions of all commercial fishing vessels are monitored through a global positioning monitoring system that provides near real time information about the entire fishing fleet's activities. This system enables a comparison of vessel positions with reported catch information in relation to areas closed to all fishing or to certain fishing methods.

MHDD also ignores the 2025 Finding that observers are not required to be deployed on small vessels, i.e., those under 26 feet (8 meters) in length, as permitted in 50 C.F.R. § 600.746. These types of vessels use set nets in harbors. The 2025 Finding (at 19) states that these small boats "are usually between 12 and 20 feet (four to six meters) in length, are unable to carry observers due to concerns for both human health and safety and safe vessel operations.[10] MHDD fails to show that U.S. standards would nevertheless require these small boats to carry observers

---

[10] Installation of cameras on these small boats is equally problematic since they typically do not have an adequate power source or housing to operate an electronic monitoring system. MHDD does not address this issue, either.

despite health and safety concerns. Similarly, MHDD fails to show U.S. standards require that trawl vessels that are more than 105 feet in length (32 meters) carry observers or cameras when these vessels are part of the deep-water fleet and operate in area well outside of the Māui dolphin distribution. Observer programs are in place for deepwater vessels, but MHDD does not discuss them or why they are not comparable in effective to U.S. standards. And, in any event, MHDD fails to show that these vessels operate in fisheries subject to its PI Motion.

Equally defective is MHDD's suggestion that on-board cameras are an inferior method of monitoring compared to human observers. PI Motion at 20-21. It offers no evidence in support of this suggestion, and the MMPA merely authorizes, but does not mandate, the use of observers. As noted above, the July 3, 2025 Decision Memorandum (at 12) expressly approves the use of electronic monitoring as a U.S. standard. In addition, the 2025 Finding (at 21) explains why on-board cameras are superior to observers in certain ways, including that electronic monitoring, unlike an observer, "is capable of observing marine mammal bycatch 100% of the time." Moreover, multiple cameras can look at more than one part of a fishing vessel at the same time. Also, camera footage can be repeatedly rewound, paused, and replayed to confirm initial reactions.

In summary, the 2025 Finding fully responds to the concern that this Court expressed in *MHDD I* that "the Decision Memorandum never addressed the United States monitoring standards that NMFS determined were exceeded by New Zealand's monitoring program." 799 F. Supp. 3d at 1344.

### 5. The NZG's Population Estimate

MHDD asserts that the population estimate that NMFS used to calculate the PBR level for Māui dolphins relies on an "outdated and overly optimistic population estimate without

explanation." PI Motion at 21. However, the 2025 Finding (at 22) expressly relies upon the NZG's most recent abundance survey, which it issued in 2021. MHDD does not dispute that the 2021 survey estimated the Māui dolphin population as 54 individuals with a 95% confidence interval of 48-66 dolphins over 1 year of age.

The 2025 Finding states (at 22) that, "New Zealand's procedures for updating abundance estimates, which are required for calculations of PBR are comparable in effectiveness to the U.S. regulatory program." Using the information contained in the 2021 abundance survey, NMFS calculated a PBR of 0.10. *See* 2025 Finding at 28. Nowhere does MHDD dispute the methodology that the NZG used to compile the information in the survey or the resulting PBR.

Instead, MHDD claims that the 2021 abundance survey was outdated for purposes of evaluating comparability with U.S. standards. It alleges that the 2025 Finding does not explain why this estimate is the "best available" information when NMFS "ignored a more recent population estimate of 48 Māui dolphins." PI Motion at 22. However, the fact that the Scientific Committee of the International Whaling Commission recommended an alternative abundance estimate of 48 individuals does not render it more valid than the NZG's estimate of 54 individuals for the following reasons.

First, the IWC's Scientific Committee ("SC") did not conduct any study which counted or estimated the number of dolphins, as the NZG's own study did over the course of 2020-2021. Rather, the SC relied upon the same study that the NZG conducted and that NMFS then used to calculate PBR. However, the Scientific Working Group ("SWG") of the SC made a so-called "mortality correction" to the NZG's abundance estimate. It then recommended that its new, mortality-corrected abundance estimate for Māui dolphins of 48 (95% CI 40-57) be endorsed as a "Category 3" estimate. The IWC defines a Category 3 estimate as follows:

> An estimate which is informative, *but not acceptable for inclusion in [Categories] (1A), (1B) or (2)*. This category includes estimates with an *unquantified bias* which is likely to be too severe to allow inclusion in Category 2, as well as relatively unbiased estimates that are adequate to provide some general indication of abundance while still not qualifying for (1A) or (1B). Such estimates may be used when fitting population models, *but are not for use as estimates in actual implementations of IWC management procedures* (i.e., the RMP CLA or AWMP SLAs).

(Emphasis added.)

The following conclusions flow directly from these category definitions and the SC's commentary. First, the SC only made a "recommendation." MHDD has not provided evidence that this recommendation has been adopted by the International Whaling Commission itself, which alone renders it irrelevant.

Second, even if the IWC had adopted the recommendation, it would not bind NMFS, and it would not constitute the best available scientific evidence since MHDD has not shown that there was agreement within the IWC that a "mortality correction" was appropriate.

Third, the SWG recommended that the "mortality-corrected abundance estimate . . . be endorsed as Category 3 because it anticipates that fully integrated analysis will be provided to the Committee in the future." The IWC defines a Category 3 abundance estimate as merely "informative, but not acceptable for inclusion" in estimates that are deemed more reliable, i.e., in Categories 1A, 1B, and 2 estimates.

Fourth, the IWC maintains a "Table of Accepted Abundance Estimates." This Table is available online at: https://iwc.int/about-whales/estimate. Undersigned counsel's visit to this online Table on March 5, 2026 did not list the MHDD's preferred abundance estimate of 48 individuals. Accordingly, MHDD has failed to demonstrate that the NZG's own estimate of 54 individuals is outdated due to a more recent estimate by the IWC.

MHDD also asserts that the NZG estimated bycatch of 0.38 dolphins per year in a 2022 MacKenzie, et al. report, which is "nearly four times higher than both the bycatch rate in the Roberts report and NMFS's PBR value." PI Motion at 24. MHDD's reliance on the MacKenzie, et al. report is unfounded.

The first flaw is that although MacKenzie (correctly) used the more recent 2020-2021 Māui dolphin abundance estimate of 54, his analysis was based on fishing effort data from 2016/17 to 2018/19, which precedes the October 1, 2020 fishing restrictions. *See* section 3.3 of his report, which is available at https://fs.fish.govt.nz/Doc/25300/AEBR-290-Updated-Risk-Assessment-For-New-Zealand-Marine-Mammals-4286.pdf.ashx).

Second, the Roberts report, upon which MacKenzie relied, was issued in 2019 but used the previous 2015-2016 Māui dolphin abundance estimate of 63 and was based on fishing effort data from 2014/15 to 2016/17, which also preceded the October 1, 2020 fishing restrictions.

Hence, the estimated bycatch rates in both reports are irrelevant as they preceded the NZG's implementation of additional fishing restrictions on October 1, 2020. Therefore, NMFS had no obligation to consider either report.

.          **6.  Māui Dolphin Bycatch**

MHDD claims that the 2025 Finding "did not provide a source" for the NZG's estimated bycatch rate of 0.056 mean annual Māui dolphin deaths in order to conclude that the PBR of 0.10 had not been exceeded. PI Motion at 23. However, the bycatch estimate of 0.056 is a product of the NZG's use of the SEFRA model, which the NZG fully explained in its application for the 2024 Comparability Finding. *See* ECF No. 25-5, NMFS_004456, in Court No. 24-00218. Moreover, the 2025 Finding (at 29-30) expressly describes the SEFRA model, and footnote 1 to

the 2025 Finding states that NMFS relied on "New Zealand's initial application and supporting materials, [and] supplemental material provided to NMFS in past litigation."

MHDD feigns ignorance of NMFS's reliance on these materials to support the 2025 Finding, but the law is clear that government officials are presumed to have reviewed the entire record.

### 7. The Hector's Dolphin Fisheries

Hector's dolphin populations are found around the South Island with the largest populations located off its West Coast and East Coast. The NZG's 2020 Threat Management Plan, which the 2025 Finding expressly references (at 13), states that:

> New Zealand has implemented bycatch mitigation measures that are comparable to what is required by the U.S. regulatory program for 16 U.S.C. § 1387(f)(3) stocks. New Zealand's Māui and Hector's dolphins are considered 16 U.S.C. § 1387(f)(3) stocks. See question 2d for the mitigation measures for each fishery. New Zealand has provided a copy of its Threat Management Plan for both species that outlines all of the steps it is taking to mitigate bycatch for these two species (including a trigger that if one animal is caught the fishery is closed). New Zealand maintains a web accessible database on reported events that include deaths, strandings, and bycatch of both species. The development and implementation of these measures are comparable in effectiveness to U.S. standards for Take Reduction Plans.[11]

The NZG's response to Question 2d, mentioned in the second above-quoted sentence, lists in Table 2 each bycatch mitigation measure in effect for each of the nine fisheries. covered by MHDD's PI Motion, i.e., Fishery ID nos. 1883, 1978, 2041, 2046, 2047, 2051, 2052, 2067, and 2077.

NMFS also expressly relies on the 2020 Threat Management Plan "for both species," meaning for both Hector's and Māui dolphins. The TMP expressly discusses the following

---

[11] MHDD omits from its own quotation the first two sentences of this statement. PI Motion at 26. Those sentences establish that NMFS found that the "bycatch reduction measures" that the NZG implemented for Hector's dolphins were comparable in effectiveness to U.S. standards.

subjects related to Hector's dolphins, including whether the NZG's comprehensive South Island fishing restrictions and monitoring measures are comparable in effectiveness to U.S standards: (1) the abundance estimate for Hector's dolphins; (2) the description of the threat presented by commercial set net and trawl fishing; (3) the TMP's long term goal to ensure that human-induced threats are managed to allow Hector's (and Māui) dolphins to "thrive and recover"; (4) the management of human impacts to allow the Hector's dolphin population to increase to a level at or above 90% of the maximum number of dolphins that the environment can support; (5) measures to ensure that dolphin deaths arising from fishing threats (a) do not exceed the maximum number of human induced-deaths that could occur to achieve the applicable population outcome with 95% certainty, (b) cause localized depletion, or (c) create substantial barriers to dispersal or connectivity between subpopulations; (6) the imposition of additional restrictions on the use of set nets and trawls; (7) the expansion of two of the five marine mammal sanctuaries; and (8) adoption of a five-year research plan to ensure that management measures are achieving the TMP's goals.

MHDD asserts that the 2025 Finding "is completely silent on nearly every relevant U.S. standard that applies to Hector's dolphin bycatch." PI Motion at 25. However, NMFS' reliance in part on the NZG's TMP illustrates that it fully considered whether the NZG's measures were comparable in effectiveness to U.S. standards. Admittedly, the 2025 Finding itself could have elaborated to a greater extent on the information that NMFS used to find that the Hector's dolphin set net and trawl fisheries complied with U.S. standards, but the courts have uniformly held that the arbitrary and capricious standard of review does not require perfection.

### 8.  Bycatch of Hector's Dolphins

Finally, MHDD asserts that "available evidence shows that [Hector's dolphin] bycatch rates exceed the bycatch limits" that apply under U.S. standards." PI Motion at 27. In support of this claim, MHDD cites "publicly available data" contained in Ms. Slooten's Declaration (at para. 36) which allegedly constitutes "the latest government estimate of [Hector's dolphin] bycatch in commercial set net and trawl fisheries" for both the Otago and Kaikoura populations. This data allegedly shows that for these two populations, the estimated bycatch exceeds PBR, as well as the ZMRG and the negligible impact standard.

However, Ms. Slooten's Declaration has failed to demonstrate that she has used population estimates that align with the spatial boundaries of the sub- and local Hector's dolphin populations as they are managed under the TMP, which directly affect how bycatch limits are calculated and to which estimated bycatch is compared. And, although Ms. Slooten relies on a public consultation document entitled "Protecting South Island Hector's dolphins – Supporting Information: Further consultation on fisheries measures (2021)," she omits reference to subsequent decision documents and collective measures that were put in place to manage fisheries bycatch below each population's bycatch limit. As such, the Court should disregard her assertion that Hector's dolphin bycatch has exceeded the applicable bycatch limits.

39

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny MHDD's PI Motion.

Respectfully submitted,

/s/ Warren E.Connelly
Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760

wconnelly@tradepacificlaw.com

Date: March 9, 2026

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION</u>

This document contains 12,702 words and, therefore, complies with the 14,000-word limitation in Standard Chambers Procedures 2(B)(1).

<u>/s/ Warren E. Connelly</u>

Warren E. Connelly