## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 1:26-cv-00060-JCG |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## <u>ORDER</u>

Upon consideration of defendants' motion to dismiss for lack of jurisdiction, it is hereby

ORDERED that defendants' motion to dismiss is GRANTED; and it is further

ORDERED that the action is DISMISSED.

Dated: _____                    _____
       New York, N.Y.                                                    JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>NATIONAL MARINE FISHERIES SERVICE, et al., )<br><br>Defendants, )<br><br>and )<br><br>NEW ZEALAND GOVERNMENT, )<br><br>Defendant-Intervenor. ) | Court No. 1:26-cv-00060-JCG |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELMINARY INJUNCTION
AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)**

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

ZACHARY SCOTT SIMMONS
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

March 9, 2026

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

AGATHA KOPROWSKI
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................. iv

Introduction ............................................................................................................ 1

   I.   Factual and Procedural Background ................................................................ 4

   II.  The Marine Mammal Protection Act ............................................................. 6

   III. The Administrative Procedure Act ................................................................ 7

Summary of the Argument ..................................................................................... 7

Argument ................................................................................................................ 9

   I.   The Action Should be Dismissed for Lack of Subject Matter Jurisdiction ......... 9

     A.  Standard of Review ................................................................................. 9

     B.  MHDD Lacks Standing ........................................................................ 10

        1.  MHDD Asserts That Its Injury May Only Be Redressed by Closure of
           All Set-Net and Trawl Fisheries ...................................................... 11

        2.  An Import Prohibition Under the MMPA Has Never Resulted in the
           Closure of a Foreign Fishery ........................................................... 12

        3.  Neither This Court Nor The Government Has Authority To Direct
           Foreign Regulation Of Commercial Fisheries ................................. 15

        4.  MHDD Must Show Causation on a Fishery-by-Fishery Basis ............ 19

   II.  The PI Motion Should Be Denied ................................................................ 22

     A.  The PI Motion Should Be Construed As A Petition For Writ of Mandamus ......... 22

     B.  Standard of Review .............................................................................. 23

     C.  MHDD Is Not Likely to Succeed On The Merits ..................................... 24

        1.  Absent Jurisdiction, There Can Be No Likelihood of Success ............ 24

        2.  Even If The Court Concludes It Has Jurisdiction, The Relief Sought By
           MHDD Is Not Available .................................................................. 24

        3.  MHDD Cannot Demonstrate That The 2025 Comparability Findings
           Are Arbitrary And Capricious .......................................................... 28

           a.  Overview of U.S. Fisheries Regulations ..................................... 29

           b.  New Zealand Maintains a Regulatory Program Aimed at Achieving
               ZMRG and is Comparable in Effectiveness to the U.S. Program ...... 31

           c.  The MMPA Does Not Requir Closing U.S. Domestic Fisheries If
               They Have Not Achieved the Zero Rate Mortality Goal .................. 33

            d.  The Negligible Impact Standard Is Only Relevant When A Fishery
               Seeks An Affirmative License to Take Marine Mammals .................. 35

    e.   Monitoring of Commercial Fisheries In New Zealand Is Comparable to U.S. Monitoring.............................................................................................. 36

    f.   MHDD Does Not Explain How A Different Population Estimate Or Bycatch Determination Would Alter NMFS's Analysis ................................................... 37

    g.   The Record Evidence Demonstrates The Bycatch of Hector's Dolphins Is Not In Excess of U.S. Standards............................................................................... 39

  D.   MHDD Cannot Show That It Will Be Immediately And Irreparably Injured Absent Injunctive Relief............................................................................................................. 40

  E.   The Public Interest Would Not Be Better Served By An Injunction And The Balance Of Hardships Favor the Government ................................................................................. 42

III.  MHDD Is Required To Pay Security Before Obtaining Injunctive Relief......................... 44

Conclusion ............................................................................................................................ 45

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                       **Page(s)**

*Akiachak Native Community v. U.S. Dep't of Interior,*
    827 F.3d 100 (D.C. Cir. 2016) ............................................................................................ 22

*Allen v. Wright,*
    468 U.S. 737 (1984) ....................................................................................................... 8

*Am. Inst. for Imported Steel, Inc. v. United States,*
    600 F. Supp. 204 (Ct. Int'l Trade 1984) ......................................................................... 23

*Animal Legal Defense Fund v. Quigg,*
    932 F.2d 920 (Fed. Cir. 1991) ............................................................................ 9, 17, 18

*Arbaugh v. Y & H Corp.,*
    546 U.S. 500 (2006) ..................................................................................................... 10

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009) ............................................................................... 23, 24

*Camp v. Pitts,*
    411 U.S. 138 (1973) ..................................................................................................... 26

*Cedars-Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993) ....................................................................................... 9

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988) ..................................................................................................... 14

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
    587 U.S. 262 (2019) ..................................................................................................... 25

*Consol. Edison Co. v. Nat'l Labor Relations Bd.,*
    305 U.S. 197 (1938) ..................................................................................................... 38

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ..................................................................................................... 38

*Cordis Corp. v. Medtronic, Inc.,*
    835 F.2d 859 (Fed. Cir. 1987) ...................................................................................... 22

*Engage Learning, Inc. v. Salazar,*
    660 F.3d 1346 (Fed. Cir. 2011) ..................................................................................... 9

*Essar Steel Ltd. v. United States,*
 678 F.3d 1268 (Fed. Cir. 2012) ............................................................... 16

*Fla. Power & Light Co. v. Lorion,*
 470 U.S. 729 (1985) ............................................................................... 27

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
 602 U.S. 367 (2024) ............................................................................... 10

*Haaland v. Brackeen,*
 599 U.S. 255 (2023) ............................................................................... 16

*Harisiades v. Shaughnessy,*
 342 U.S. 580 (1952) ................................................................................. 2

*Hertz Corp. v. Friend,*
 559 U.S. 77 (2010) ............................................................................ 9, 10

*In re Am. Rivers & Idaho Rivers United,*
 372 F.3d 413 (D.C. Cir. 2004) ........................................................... 24, 25

*In re Volkswagen of Am., Inc.,*
 566 F.3d 1349 (Fed. Cir. 2009) ............................................................... 23

*Kwan v. United States,*
 272 F.3d 1360 (Fed. Cir. 2001) ................................................................. 2

*Linda R.S. v. Richard D.,*
 410 U.S. 614 (1973) ............................................................................... 18

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ......................................................................... 10, 20

*Māui & Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Serv.,*
 799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ........................... 5, 6, 24, 25

*Mideast Sys. & China Civil Construction Saipan Jt. Venture, Inc. v. Hodel,*
 792 F.2d 1172 (D.C. Cir. 1986) ............................................................ 8, 16

*Nat. Resources Def. Council v. Ross,*
 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ........................................... 13

*Nat. Resources Def. Council v. Ross,*
 348 F. Supp. 3d 1306 (Ct. Int'l Trade 2018) ........................................... 43

*NEXTEEL Co. v. United States*,
  28 F.4th 1226 (Fed. Cir. 2022) ........................................................................ 9, 27

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
  345 F.3d 1379 (Fed. Cir. 2003) ...................................................................... 16, 27

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................. 42

*Purdue Pharma L.P. v. Collegium Pharm., Inc.*,
  86 F.4th 1338 (Fed. Cir. 2023) ...................................................................... 22, 23

*Reynolds v. Army & Air Force Exch. Serv.*,
  846 F.2d 746 (Fed. Cir. 1988) .............................................................................. 9

*Roberto v. Dep't of the Navy*,
  440 F.3d 1341 (Fed. Cir. 2006) ........................................................................... 25

*Rumsfeld v. United Techs. Corp.*,
  315 F.3d 1361 (Fed. Cir. 2003) ........................................................................... 16

*Sea Shepherd New Zealand v. United States*,
  606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ............................................... *passim*

*Sea Shepherd New Zealand v. United States*,
  693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) ..................................................... 5, 22

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................................... 7, 8, 17, 18

*Sofamor Danek Grp. v. DePuy-Motech, Inc.*,
  74 F.3d 1216 (Fed. Cir. 1996) ............................................................................. 23

*S. Dakota v. Dole*,
  483 U.S. 203 (1987) ............................................................................................. 15

*U.S. Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*,
  413 F.3d 1344 (Fed. Cir. 2005) ........................................................................... 24

*Unemployment Comp. Comm'n of Alaska v. Aragon*,
  329 U.S. 143 (1946) ............................................................................................. 16

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................................. 43

vi

*United Transp. Union v. Interstate Commerce Comm'n*,
  891 F.2d 908 (D.C. Cir. 1989) ................................................................. 15

*University of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ............................................................................... 23

*Winter v. Natural Res. Defense Council*,
  555 U.S. 7 (2008) ................................................................................... 23

*Wyoming v. Dep't of Agric.*,
  414 F.3d 1207 (10th Cir. 2005) .............................................................. 22

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) ................................................................ 23

**Statutes**

5 U.S.C. § 702 ........................................................................................... *7*

5 U.S.C. § 706 ................................................................................... *passim*

16 U.S.C. § 1371 .............................................................................. *passim*

16 U.S.C. § 1378 ................................................................................... 1, 43

16 U.S.C. § 1387 .......................................................................... 30, 39, 40

28 U.S.C. § 1581 ............................................................................ 7, 17, 18

28 U.S.C. § 1651 ....................................................................................... 23

28 U.S.C. § 2640 ......................................................................................... 7

28 U.S.C. §§ 1601-08 .............................................................................. 17

**Rules**

USCIT R. 12 ...................................................................................... 1, 9, 10

USCIT R. 65 ............................................................................................. 44

Fed. R. Evid. 806 .................................................................................... 13

**Regulations**

50 C.F.R. § 216.24 ............................................................................ *passim*

50 C.F.R. § 216.3 ..................................................................................... 27

50 C.F.R. § 229.33 ................................................................................... 34

**Administrative Determinations**

*Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*,
    81 Fed. Reg. 54,390 (Dep't of Commerce Aug. 15, 2016).......................................... 2, 3, 6, 34

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Comparability Findings and Implementation of Import Restrictions;
    Certification of Admissibility for Certain Fish Products*,
    90 Fed. Reg. 42,395 (Dep't of Commerce Sept. 2, 2025) ....................................... 5, 6

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Issuance of Comparability Findings*,
    89 Fed. Reg. 4,595 (Dep't of Commerce Jan. 24, 2024) ........................................... 5

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act-Notification of Rejection of Petition and Issuance of Comparability Findings*,
    85 Fed. Reg. 71,297 (Dep't of Commerce Nov. 9, 2020)........................................... 4

*List of Fisheries*,
    89 Fed. Reg. 12,257 (Dep't of Commerce Feb. 16, 2024) ............................................... *passim*

*Notification of the Rejection of the Petition to Ban Imports of All Fish and Fish Products From
    New Zealand That Do Not Satisfy the Marine Mammal Protection Act*,
    84 Fed. Reg. 32,853 (Dep't of Commerce July 10, 2019)........................................... 4

**Other Authorities**

Center for Biological Diversity, *et al.*, *North American Environmental Commission Confirms
    Mexico's Role in Imperiling Vaquita* (Aug. 19, 2025),
    *available at* https://biologicaldiversity.org/w/news/press-releases/north-american-
    environmental-commission-confirms-mexicos-role-in-imperiling-vaquita-2025-08-
    19/email_view/.................................................................................... 12

Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., *List of Fisheries Summary Table*,
    *available at* https://www.fisheries.noaa.gov/national/marine-mammal-protection/list-fisheries-
    summary-tables ...................................................................................... 28

H.R. Rep. No. 92-1488 (1972) (Conf. Rep.)............................................................... 34

NMFS, Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal
  Protection Act (Feb. 7, 2023) (SAR Guidelines), *available at*
  https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-
  kdr.pdf ........................................................................................................................................ 29

NMFS, *MMPA Import Provisions Comparability Finding*
  *Application Final Report - Mexico* (Aug. 29, 2025), *available at*
  https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf .......................... 11, 27

NMFS, Northeast/Mid-Atlantic American Lobster and Jonah Crab Trap/Pot Fishery, *available at*
  https://www.fisheries.noaa.gov/national/marine-mammal-protection/northeast-mid-atlantic-
  american-lobster-and-jonah-crab-trap-pot ................................................................................ 36

Restatement (Fourth) Foreign Relations Law of the United States,
  Part IV, Introductory Note (Am. Law Inst. 2018) .................................................................... 17

S. Rep. No. 92-863 ............................................................................................................................ 1

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security, respectfully file this opposition in response to the motion for preliminary injunction filed by plaintiff, Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) (Jan. 30, 2026), ECF No. 16 (PI Motion). For the reasons below, MHDD's motion should be denied.

In addition, pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the Court (USCIT R.), defendants respectfully request that the Court dismiss the action because MHDD has not established that it has standing to pursue its claims.

## INTRODUCTION

Throughout this litigation, MHDD broadly accuses the United States of ignoring the statutory scheme developed by Congress in the Marine Mammal Protection Act (MMPA) and, in turn, the precarious state of vulnerable marine mammal populations across the globe. MHDD's accusations are misplaced. MHDD's myopic focus on a single mechanism authorized by the MMPA—the import prohibition of 16 U.S.C. § 1371(a)(2)—disregards the array of tools provided to the Executive Branch to promote the international partnership and cooperation that Congress deemed necessary to effectively tackle the challenge of marine mammal conservation. *See, e.g.*, S. Rep. No. 92-863, at 10 (1972) ("[U]nilateral action by the United States affecting any species or subspecies of marine mammal could be fruitless unless other nations involved in the taking of marine mammals work with the United States to preserve and protect these creatures.").

The statutory tools afforded to the Executive Branch by the MMPA include sticks, such as the § 1372(a)(1) import prohibition, and carrots, including mandates to enter into negotiations for international agreements and seek to revise treaties to be consistent with the underlying purpose of the MMPA. *See generally* 16 U.S.C. § 1378. Through its regulations, NMFS has

elaborated on the foreign policy role Congress envisioned, contemplating particular actions to promote international cooperation and coordination, such as technical assistance, research cooperation, and technology transfers. 50 C.F.R. § 216.24(h)(11).

Balancing the use of these carrots—like technical assistance—against the threat of the stick—an import prohibition—to promote foreign policy objectives and aid in international negotiations is a task for which the Executive Branch is fundamentally equipped to handle and with which the Judicial Branch should be especially cautious to avoid interference. *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) ("[P]olicies in regard to the conduct of foreign relations . . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) ("[Government-to-government] negotiations are consigned to the executive branch in its conduct of foreign relations").

Congress, while mandating prohibitions under certain circumstances, left the *determination* of those circumstances to the Secretary of Commerce, who alone is statutorily authorized to apply the purposefully amorphous phrase "United States standards" to foreign fisheries. 16 U.S.C. § 1371(a)(2). The Secretary of Commerce, acting through NMFS, retained this flexibility in assessing the efficacy of marine mammal protections in foreign commercial fisheries by promulgating regulations that determine "United States standards" with reference to an equally flexible term, "comparability." 50 C.F.R. § 214.26(h)(1). As should be self-evident, comparability does not require one-for-one equality. *See, e.g.*, *Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390, 54,401 (Dep't of Commerce, Aug. 15, 2016) (MMPA Imports Rule) (explaining that the comparability "approach

gives harvesting nations flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results").

Harnessing a carrot, like technical assistance, to extract commitments from international partners to revise existing regulatory regimes, while allowing NMFS to withdraw the threat of a stick, like an embargo, even if such revisions are not completely in effect is essential to effectuating the underlying statutory purpose of promoting conservation efforts globally and not just in the waters under the jurisdiction of the United States. *See, e.g., id.* at 54,403 ("NMFS believes that [implementing new regulations or revising existing regulations by foreign harvesting nations] should be encouraged rather than penalized. In those situations, NMFS must determine whether such regulations are likely to, or are making progress toward, reducing marine mammal bycatch."); 50 C.F.R. § 216.24(h)(7)(iii) (requiring NMFS to consider "[w]hether the measures adopted by [a] harvesting nation . . . will *likely* reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the *progress* of the regulatory program toward achieving its objectives") (emphasis added).

Undergirding MHDD's position in this litigation is the mistaken belief that judicial interference in foreign policy will promote rather than impede international cooperation to improve marine mammal conservation. This unsupported belief cannot be further from the truth. Previously, the imposition of a Court-ordered MMPA import prohibition resulted in profound disruptions of cooperative efforts with an international trading partner and devastating results for a critically endangered species.

This Court should seek to avoid such interference, particularly when there is nothing more than conjecture to demonstrate that any legal remedy within its authority could provide

MHDD with relief from its alleged injuries. Meanwhile, the unintended consequences could prove tragic for the very species MHDD purports to want to protect.

I.    Factual and Procedural Background

On February 9, 2019, two environmental organizations (collectively Sea Shepherd) submitted a petition to NMFS seeking emergency rulemaking to ban the importation of all fish and fish products sourced using fishing activities that resulted in the incidental kill or incidental serious injury of Māui dolphins in excess of United States standards, as required by the MMPA, 16 U.S.C. § 1371(a)(2). NMFS denied Sea Shepherd's petition. *Notification of the Rejection of the Petition to Ban Imports of All Fish and Fish Products From New Zealand That Do Not Satisfy the Marine Mammal Protection Act*, 84 Fed. Reg. 32,853 (Dep't of Commerce July 10, 2019).

Sea Shepherd subsequently filed a complaint in this Court alleging that the United States had unlawfully withheld agency action by failing to ban the importation of commercial fish in the Māui dolphin's range. *See* Complaint, *Sea Shepherd New Zealand v. United States*, No. 20-112 (Ct. Int'l Trade May 21, 2020), ECF No. 1. The United States moved for a voluntary remand to allow NMFS to determine whether to issue comparability findings based on then-recently enacted regulations by New Zealand, resulting in another denial of Sea Shepherd's petition and the issuance of comparability findings for certain New Zealand fisheries. *See Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act-Notification of Rejection of Petition and Issuance of Comparability Findings*, 85 Fed. Reg. 71,297 (Dep't of Commerce Nov. 9, 2020).

Sea Shepherd filed a motion for preliminary injunction, which the Court issued on November 28, 2022, directing the United States to prohibit the importation into the United States of products from New Zealand's West Coast North Island commercial set-net and trawl fisheries.

4

*Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) (*Sea Shepherd I*).

The Government of New Zealand (NZG) subsequently provided additional evidence concerning the regulation of the fisheries subject to the *Sea Shepherd I* injunction and, on January 24, 2024, NMFS published new comparability findings in the Federal Register. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Issuance of Comparability Findings*, 89 Fed. Reg. 4,595 (Dep't of Commerce Jan. 24, 2024) (2024 Comparability Findings). In light of the new agency action, the Court dissolved the *Sea Shepherd I* injunction. *Sea Shepherd New Zealand v. United States*, 693 F. Supp. 3d 1364, 1367-68 (Ct. Int'l Trade 2024) (*Sea Shepherd II*).

On December 4, 2024, MHDD filed a complaint challenging the 2024 Comparability Findings. Complaint, *Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 24-cv-218 (Dec. 4, 2024), ECF No. 1 (2024 Proceedings). Following cross-motions for judgment on the administrative record, the Court vacated the 2024 Comparability Findings and remanded them to NMFS for additional consideration. *Māui & Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Serv.*, 799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) (*MHDD I* Remand Order).

On September 2, 2025, NMFS published in the Federal Register comparability determinations for approximately 2,500 fisheries from 135 harvesting nations, including the New Zealand fisheries that were the subject of the *MHDD I* Remand Order. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products*, 90 Fed. Reg. 42,395, 42,398 (Dep't of Commerce

Sept. 2, 2025) (2025 Comparability Findings). The publication in the Federal Register of the 2025 Comparability Findings shortly after this Court's decision in *MHDD I* was required under the terms of a Court order issued in separate litigation brought by unrelated parties. *See* Stipulation of Dismissal at Attachment 1, *Natural Resources Defense Council v. Raimondo*, No. 24-00148, (Ct. Int'l Trade Jan. 16, 2025), ECF No. 29 (*Raimondo*); Stipulated Order of Dismissal, *id.* (Ct. Int'l Trade Mar. 25, 2025), ECF No. 39.

On September 25, 2025, MHDD filed a motion to alter or amend the "judgment" in the 2024 Proceedings. Motion to Alter or Amend, 2024 Proceedings (Sept. 25, 2025), ECF No. 43. On November 24, 2025, the Government responded with a motion to dismiss the 2024 Proceedings because MHDD lacked standing and because the 2025 Comparability Findings superseded the 2024 Comparability Findings. Motion to Dismiss, 2024 Proceedings (Nov. 24, 2025), ECF No. 51. On January 5, 2026, without responding to the Government's Motion to Dismiss or moving to dismiss the 2024 Proceedings voluntarily, MHDD filed its complaint in this action. ECF No. 4. On January 6, 2026, the Government filed its remand comparability findings pursuant to the *MHDD I* Remand Order. On January 30, 2026, MHDD filed the PI Motion.

II.     The Marine Mammal Protection Act

The MMPA, among other things, directs the Government to ban imports of commercial fish products following a determination that harvesting of those products results in the incidental killing or serious injury of marine mammals, "in excess of United States standards." *See* 16 U.S.C. § 1371(a)(2).

The authority to implement the MMPA has been delegated to NMFS. In 2016, NMFS promulgated regulations to implement these provisions of the MMPA. *See* MMPA Imports Rule, 81 Fed. Reg. 54,390.

The MMPA Imports Rule established a process for NMFS to determine whether a foreign country maintains a regulatory program that provides for, or effectively achieves comparable results as, the United States' regulatory program. *See* 50 C.F.R. § 216.24(h). Absent a finding of comparability, fish and fish products may not be imported into the United States because those fisheries have been deemed to result in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards. 16 U.S.C. § 1371(a)(2). *See also* 50 C.F.R. § 216.24(h)(1)(ii).

III.    The Administrative Procedure Act

This Court has exclusive jurisdiction over any civil action "aris[ing] out of any law of the United States providing for . . . embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i). This Court reviews actions brought pursuant to § 1581(i) as provided in the Administrative Procedure Act (APA). *Id.* § 2640(e); 5 U.S.C. § 706. The APA establishes a private cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A person identified in § 702 may seek a court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), or to "hold unlawful and set aside" agency actions that are, among other things, "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A). *See also* Compl. ¶¶ 55, 160, 170, 177; PI Motion at 12.

## SUMMARY OF THE ARGUMENT

The Court should deny the PI Motion and dismiss the action for lack of subject matter jurisdiction because MHDD cannot establish standing.

Based on MHDD's allegations and the declarations submitted in support of the PI Motion, the alleged injury to the aesthetic and other interests of MHDD's members can only be

redressed by eliminating set net and trawl fishing in all New Zealand commercial fisheries. An import embargo under the MMPA—including the *Sea Shepherd I* embargo—has *never* resulted in the closure of a foreign fishery. Even if something less than complete closure could mitigate the alleged injury, MHDD's counsel has admitted that "we don't know" what, if anything, the NZG might do to further regulate commercial fisheries. Status Conference Audio at 1:22:20-21 (Feb. 12, 2026). Neither this Court nor the United States has any legal authority to direct an independent sovereign to take particular regulatory actions. *Cf. Mideast Sys. & China Civil Construction Saipan Jt. Venture, Inc. v. Hodel*, 792 F.2d 1172, 1177 (D.C. Cir. 1986). If "we don't know" what the NZG might do or whether it could redress the injury MHDD alleges, then MHDD cannot demonstrate that "relief from the injury [is] 'likely' to follow from a favorable decision," and this Court lacks subject-matter jurisdiction. *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Likewise, MHDD cannot establish that any alleged failure on the part of the United States to prohibit certain fish imports is fairly traceable to the alleged proximate cause of its injury—commercial fishing in New Zealand—and it has not even tried to allege that the particular fisheries identified in its complaint are actually contributing to bycatch of Māui or Hector's dolphins in excess of U.S. standards. At best, MHDD has alleged that the availability for of the U.S. market to import fish products from the challenged fisheries encourages purportedly injurious actions. Binding precedent confirms that mere encouragement of third-party acts is insufficient to establish causation. *See, e.g.*, *id.*; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976); *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 934 (Fed. Cir. 1991).

Assuming that this Court could exercise jurisdiction, MHDD has not established that it is entitled to the extraordinary relief it seeks. The injunction requested by MHDD is not available when the agency has made a determination that would preclude an import embargo. The Court cannot direct that NMFS reach a pre-determined decision or prohibit imports without the *agency* determination that United States standards are exceeded, as required by the statute. *E.g.*, *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022). MHDD also cannot demonstrate that it would be any worse if preliminary relief were denied. And the potential harm to the public—including tens, if not hundreds, of millions of dollars in affected trade and significant administrative costs borne by the taxpayers—weighs in favor of denying extraordinary relief.

## ARGUMENT

I.  The Action Should be Dismissed for Lack of Subject Matter Jurisdiction

   A.  Standard of Review

In deciding a motion to dismiss for lack of jurisdiction pursuant to USCIT R. 12(b)(1), the Court accepts as true all uncontroverted factual allegations in the complaint. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011) (analyzing identical Federal Rule of Civil Procedure). "If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). MHDD bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988), and "must support [its] allegations by competent proof," *Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must

dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). *See also* USCIT R. 12(h)(3).

Pursuant to Article III of the United States Constitution, a party bringing suit must possess a live case or controversy—that is, "a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The possibility that the alleged injury will be redressed by a favorable decision must be "likely, as opposed to merely speculative." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). (quotation marks omitted). When "a plaintiff's asserted injury arises from the [G]overnment's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" than when the plaintiff is the intended object of the Government's action. *Id.* Specifically, MHDD must "adduce facts showing that" the choices of the third parties who are the object of the Government's action "have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* Demonstrating only attenuated links between the Government and the parties directly causing injury, "that is, where the government action is so far removed from its distant (even if predictable) ripple effects" is insufficient to establish standing. *Alliance for Hippocratic Med.*, 602 U.S. at 383.

B. <u>MHDD Lacks Standing</u>

MHDD cannot establish standing to pursue its claims because it has failed to demonstrate that its alleged injury is fairly traceable the actions of the defendants and because its alleged injury cannot be redressed by this Court, and the action must be dismissed. USCIT R. 12(b)(1), (h)(3).

10

1.  MHDD Asserts That Its Injury May Only Be Redressed by Closure of All Set-Net and Trawl Fisheries

MHDD alleges that its members "enjoy and benefit from the continued presence of Māui and Hector's dolphin populations for recreational, aesthetic, spiritual, artistic, cultural, commercial, scientific, and environmental purposes," and regularly search for "other marine species,"[1] all of which are purportedly "impacted by New Zealand trawl and set net fisheries." Compl. ¶ 11.

As alleged, the direct, proximate cause of the lessened enjoyment of MHDD's members is the diminished health of various marine mammals due to the vague "impact" of New Zealand's commercial set net and trawl fisheries.

According to its expert, Elisabeth Slooten, the only solution for MHDD and its members to avoid injury is to eliminate the use of set-net and trawl fisheries. Declaration of Elisabeth Slooten, Ph.D. ¶ 26 (Jan. 30, 2026), ECF No. 17 (Slooten 2026 Decl.) ("As long as set net and trawl fishing continues within the dolphins' range, the subspecies are at significant risk of extinction."); *id.* ¶ 40. *See also* Motion for PI at 7 ("[T]he risk from set net and trawl fishing must be eliminated for Māui and Hector's dolphins to avoid extinction, much less recover."). MHDD has identified no other action that could redress the injury to the alleged aesthetic and other interests of its members.

---

[1] In the PI Motion, MHDD relies exclusively on harm to the Māui and Hector's dolphins allegedly caused by the 11 identified fisheries. *See generally* PI Motion.

2.  An Import Prohibition Under the MMPA Has Never Resulted in the Closure of a Foreign Fishery

An import embargo under the MMPA, whether ordered by this Court or following the denial of a comparability finding, has *never* led to the closure of a single foreign fishery, as illustrated by the history of this litigation.

On November 28, 2022, this Court enjoined the agency's comparability finding and ordered an immediate ban of nine species of fish caught in certain set-net and trawl fisheries operating off New Zealand's North Island. Further Order on Plaintiffs' Motion for Preliminary Injunction, *Sea Shepherd* (Ct. Int'l Trade Nov. 28, 2022), ECF No. 109.

In support of their request for injunction, the expert hired by the *Sea Shepherd* plaintiffs, confidently predicted that a ban on imports would cause New Zealand to close the challenged set-net and trawl fisheries. *See* Declaration of Dr. Glenn Simmons in Support of Plaintiffs' Renewed Motion a [sic] for Preliminary Injunction ¶ 61, ECF No. 17-11 (Simmons 2020 Decl.) ("[I]t is my expert opinion that New Zealand would respond positively to a U.S. imposed seafood trade ban by taking the necessary management and enforcement measures to prevent the Māui dolphin from becoming extinct."). Of course, this prediction that NZG would take all allegedly "necessary. . . measures to prevent the Māui dolphin from becoming extinct" by closing the challenged fisheries did not come to pass during the duration of *Sea Shepherd I* injunction from November 2022 to April 2024, as MHDD admits. *See* Slooten 2026 Decl. ¶ 41 ("The Government of New Zealand has not amended its regulations relating to the Māui dolphin since 2020."); Rose 2026 Decl. ¶ 65 ("Despite the increased knowledge of the elevated bycatch rate levels, the New Zealand government has not issued any new regulations designed to reduce bycatch since 2020."); Status Conference Audio at 1:31:37-48 (Feb. 12, 2026) (statement of counsel for NZG: "All I know is what [the NZG] did last time, which is they stood by what they

had done. They believed it was supported by the science, not by opinion."). Yet MHDD relies on this same expert and, indeed, this same declaration to support its continued speculation here. Declaration of Dr. Glenn Simmons, PHD ¶ 4 (ECF No. 17-10) (Simmons 2026 Decl.) ("I affirm that the expert analyses, opinions, and conclusions set forth in [the Simmons 2020 Decl.] remain accurate and represent my current expert analyses, opinions, and conclusions for submission in this matter."). *See also id.* ¶¶ 14, 15, 60.

The vaquita litigation cited by MHDD in its PI Motion and accompanying declarations likewise demonstrates the historical *ineffectiveness* of Court-ordered import bans on closing foreign commercial fisheries. *E.g.*, PI Motion at 29 & n.18; Simmons 2020 Decl. ¶¶ 62-69. In July 2018, this Court issued a preliminary injunction banning imports of fish and fish products from Mexico caught with gillnets in the range of the vaquita, a critically endangered porpoise endemic to the Upper Gulf of California. *Nat. Resources Def. Council v. Ross*, 331 F. Supp. 3d 1338, 1371-72 (Ct. Int'l Trade 2018) (*Ross*). Rejecting the Government's standing arguments, the Court concluded that "the third parties in question" (specifically, Mexico and commercial fishers and illegal poachers operating in Mexico) "are likely to respond to a United States import ban in a way that reduces danger to the vaquita and consequently harm to plaintiffs' recreational and esthetic interests." *Id.* at 1359. Despite import bans that have continued to this day, gillnet fishing continues to endanger the survival of the vaquita. *See, e.g.*, NMFS, *MMPA Import Provisions Comparability Finding Application Final Report - Mexico* at 2 (Aug. 29, 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf ("Mexico still fails to implement a regulatory program to reduce or eliminate vaquita bycatch that is comparable in effectiveness to the United States.").

Recognizing the failure of the MMPA import prohibitions to redress their injuries, the same environmental organizations that successfully obtained injunctive relief in *Ross* sued again *four years later*, alleging that another import prohibition under a separate statutory authority was required to redress the ongoing, *unredressed* injury to their aesthetic, recreational, and other interests in the vaquita. *See generally* Complaint, *Ctr. Biological Diversity v. Haaland*, Court No. 1:22-cv-00339 (Ct. Int'l Trade Dec. 14, 2022).

Public statements by these same groups indicate that, after *seven years*, the MMPA prohibitions *still have not had* the intended effect on their alleged injuries. *See, e.g.*, Center for Biological Diversity, *et al.*, *North American Environmental Commission Confirms Mexico's Role in Imperiling Vaquita* (Aug. 19, 2025), *available at* https://biologicaldiversity.org/w/news/press-releases/north-american-environmental-commission-confirms-mexicos-role-in-imperiling-vaquita-2025-08-19/email_view/ (last visited Mar. 9, 2026) (attributing the continued drive of the vaquita to extinction to Mexico's failure to enforce fishery regulations and the elusion of the trade embargo by Mexican fishers).

That the MMPA import prohibitions have been inadequate to convince the Government of Mexico to take sufficient measures to protect the vaquita from commercial fishing activities is disappointing. But if the statutory tools available are inadequate to effect the lofty legislative goals of Congress, that does not justify the expansion of this Court's jurisdiction beyond constitutional and statutory limitations. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988). Indeed, as demonstrated below, it was almost certainly the previous action by this Court that disrupted NMFS's efforts to negotiate additional vaquita protections with Mexico, dooming a cooperative international approach at a critical time for the nearly-extinct vaquita.

Even if Congress had limited the Government's international engagement under the MMPA solely to the imposition of import embargoes—and it did not, despite what MHDD suggests, PI Motion at 28-29—both Congress and MHDD are free to live in a world of magical thinking, where hopes and dreams are sufficient to establish chains of causation and redress, but this Court cannot. *E.g.*, *S. Dakota v. Dole*, 483 U.S. 203, 211-12 (1987). "[C]ourts should bear in mind that when Congress predicts that an injury is caused by a certain behavior or phenomenon and when it predicts the likely impact of legislation, it performs a task that is quite different from both the 'fairly traceable' and 'redressability' portions of the Article III standing inquiry." *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 916 (D.C. Cir. 1989). "A court's causation inquiry is much more rigorous . . . it must determine that the causal nexus is firm." *Id.*

Accordingly, without anything other than MHDD's conjecture that its requested relief would redress its alleged injury despite all historical evidence to the contrary, MHDD lacks standing.

3.  Neither This Court Nor The Government Has Authority To Direct Foreign Regulation Of Commercial Fisheries

To support standing, which it addresses in a single footnote, MHDD points to out-of-court, conclusory statements of two purported experts and three of its members. *See* PI Motion at 29 n.18.

It is unclear what qualifications Dr. Simmons, an accomplished fisheries consultant, or Dr. Slooten, a respected zoologist, have to opine on the scope of regulatory actions the NZG, a sovereign government, might or might not take. *See* Simmons 2020 Decl. ¶¶ 60-61; Simmons 2026 Decl. ¶¶ 14-15; Slooten Decl. ¶ 46. But even if they were qualified, whether this Court has the authority to accord relief that would likely result in reducing or eliminating commercial set net and trawl fishing in New Zealand is a legal determination because it is contingent on the

15

statutory authorities of this Court and the agencies identified in this action. MHDD cannot rely on the testimony of self-appointed experts to determine an issue of law. *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003).[2] *See also, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 293-294 (2023) (explaining that "[r]edressability requires that the court be able to afford relief *through the exercise of its power*" and rejecting standing when the requested "injunction would not give petitioners legally enforceable protection from the alleged harm") (quotation marks omitted); *Mideast Sys.*, 792 F.2d at 1177 (explaining plaintiff lacked standing because redress was unavailable without intervening actions by third parties).

The legal authorities of both the Court and Government could not bind any party to take any action to redress MHDD's alleged harm. This Court may conclude—as MHDD alleges— that NMFS issued its comparability findings in a manner not in accordance with law, and so "hold unlawful and set aside" those final agency actions. 5 U.S.C. § 706(2)(A). But it may not step into the shoes of an agency and direct it to reach a foregone conclusion that United States standards have been exceeded. *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1279 (Fed. Cir. 2012); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381-82 (Fed. Cir. 2003).

NMFS may conclude—as MHDD alleges—that a foreign commercial fisheries management regime results in marine mammal take in excess of U.S. standards, thereby triggering an import prohibition. But none of the Government agencies named in this action, or

---

[2] To the extent that the Court views this issue to be one of fact, then the Government should be permitted to cross-examine each of MHDD's declarants before the Court relies on hearsay declarations to support injunctive or other relief. *See* Fed. R. Evid. 806 (permitting the party against whom a hearsay statement was admitted to call the declarant as a witness and cross-examine the declarant on the statement). As an action pursuant to 28 U.S.C. § 1581(i) proceeds without discovery, the Government would respectfully request an evidentiary hearing at which each of MHDD's expert and fact declarants would appear as a witness for cross-examination.

any other, can direct a foreign sovereign nation to undertake specific policy actions or to regulate the actions of commercial fishers operating in waters on the other side of the world. *See, e.g.*, Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note (Am. Law Inst. 2018). This Court likewise has no authority to direct a foreign sovereign to take any particular action. *Cf.* 28 U.S.C. § 1581. And any Court exercise of jurisdiction over a foreign nation is cabined by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601-08, and customary international law, which do not permit a trial court to direct an independent, sovereign nation to undertake a discretionary regulatory or policy action in a predetermined manner.

In the absence of any legal authority to order redress, MHDD instead relies on the purported "encouragement" of NMFS, on the one hand, to sustain New Zealand commercial fishing practices allegedly causing MHDD's injury, Compl. ¶ 14 (alleging that "[t]he MMPA requires NMFS to ensure that the U.S. seafood market does not encourage or sustain New Zealand fisheries" that do not meet U.S. standards), and of this Court, on the other, to promote foreign fishing practices that would allegedly be better at protecting the vulnerable marine mammal species living off the coasts of New Zealand, *see* PI Motion at 35 (arguing that "[b]anning imports . . . would serve the public interest by . . . encouraging foreign fisheries to better protect their marine mammal populations"). Encouragement alone cannot establish standing. *Simon*, 426 U.S. at 43-45 (plaintiffs could not establish standing when challenged tax rule merely "encouraged" hospitals to withhold certain services that were the direct cause of the alleged injuries); *Animal Legal Defense Fund*, 932 F.2d at 934 (alleged monetary injuries to farmers could not be fairly traced to the mere "encouragement" of certain research and development activities due to change in patent policy).

17

The chain of causation here is far more attenuated than that rejected in *Simon* and *Animal Legal Defense Fund*. In those cases, the alleged encouragement of U.S. Government agencies targeted persons over which those agencies had direct legal authority and who were, in turn, the alleged proximate cause of the plaintiffs' injuries. In this action, MHDD has alleged that the direct cause of MHDD's injury is commercial fishing in New Zealand. The United States does not regulate commercial fishing in New Zealand. Any management of those fisheries is overseen by the NZG, an independent sovereign state.

Even if the Government's purported "encouragement" of commercial set net and trawl fishing in New Zealand ended, it is far from clear what consequences for commercial fishing in New Zealand, if any, would follow. Counsel for MHDD readily conceded that simply "we don't know" what New Zealand could do in response to an import prohibition. Status Conference Audio at 1:22:20-21 (Feb. 12, 2026). And the NZG is likely *precluded* under its domestic law from considering the level of export market access when determining whether to modify its current fisheries management practices. Declaration of Emma Taylor in Support of the NZG's Opposition to the Plaintiff's PI Motion ¶ 4 (Taylor Decl.).[3] The Supreme Court has rejected theories of standing that rely on far more coercive state action to encourage third parties. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (holding that it was "only speculative" that prosecuting a father who had failed to pay child support would result in future payment). MHDD can cite no appellate precedent that supports their attenuated theory of "encouragement."

MHDD obliquely suggests that economic pressures could alter fishers' behaviors. *E.g.*, Rose Decl. ¶ 74, 83. Assuming that the statistics cited in MHDD's hearsay declarations are accurate, MHDD might be able to establish that, by closing the U.S. export market, the *Sea*

---

[3] This declaration is attached as an exhibit to NZG's response to the PI Motion, ECF No. 46-1.

*Shepherd I* caused a decrease in fishery exports. *Id.* ¶ 74. This tautology does not demonstrate that *fishing operations* in the embargoed fisheries were affected by the prior injunction. Although economic pressures are not irrelevant to any individual decisionmaker, MHDD leaves us to guess the elasticity of markets for these fisheries, the extent with which their sales rely on domestic demand, or other factors that would be required for an informed economic analysis.

While "we don't know" what New Zealand might do in response to a future order, we do know how harvesting nations, including New Zealand, have previously responded to MMPA import bans: they have allowed commercial fishing to continue unabated. *See* Slooten 2026 Decl. ¶ 41; Rose 2026 Decl. ¶ 65; Status Conference Audio at 1:31:37-48 (Feb. 12, 2026).

4.   <u>MHDD Must Show Causation on a Fishery-by-Fishery Basis</u>

Even if the Court were to accept MHDD's attenuated conjecture to establish causation and redressability, MHDD still fails to establish standing because it has made no effort to allege that the particular fisheries it challenges have led to marine mammal bycatch in excess of U.S. standards.

In its complaint, MHDD challenges 15 fisheries, identified by the Fishery ID Numbers assigned by NMFS: 1883, 1968, 1969, 1977, 1978, 2041, 2046, 2047, 2051, 2052, 2053, 2054, 2064, 2067, and 2077. Compl. ¶¶ 94. However, in its PI Motion, MHDD only seeks preliminary injunctive relief on 11 of those 15 fisheries: 1883, 1969, 1977, 1978, 2041, 2046, 2047, 2051, 2052, 2067, and 2077. PI Motion at 11-12. This discrepancy alone raises questions about MHDD's current request for extraordinary relief. If Māui and Hector's dolphins risk extinction "[a]s long as set net and trawl fishing continues within the dolphins' range," how can an injunction covering only a subset of those fisheries allegedly operating in that range redress the injury to the aesthetic, recreational, and other interests of MHDD's members? Or do those

fisheries not contribute to the endangerment of the species? If those fisheries do not contribute, what evidence demonstrates that the ones in the PI Motion do?

As with so many other aspects of MHDD's case: "we don't know." Status Conference Audio at 1:22:20-21 (Feb. 12, 2026).

Putting aside this discrepancy, determinations of comparability findings are made on a fishery-by-fishery basis. 50 C.F.R. §§ 216.24(h)(1)(i), (6); NMFS, Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings – Decision Memorandum at 17 (2025 Decision Memorandum, attached as Exhibit A) ("The final rule requires that comparability finding determinations be issued on a fishery-by-fishery basis.").

MHDD nowhere attempts to make allegations specific to the fisheries challenged in its Complaint. In fact, its expert repeatedly emphasizes that products caught in New Zealand fisheries *cannot* be traced to products imported into the United States. Simmons 2026 Decl. ¶ 11 ("New Zealand fisheries suffer from a severe lack of traceability."); Simmons 2020 Decl. ¶ 20 ("[I]t will be impossible to determine the origin in New Zealand waters of the fish products . . . whether any of those products are from Māui dolphin habitat."); *id.* ¶ 28 ("In short, the New Zealand fishery suffers from a severe lack of traceability that renders it extremely difficult, if not virtually impossible, to attribute marine mammal bycatch to specific FMAs, QMAs, or fisheries statistical areas.").

In order to establish causation, MHDD must demonstrate that the continued operation of each challenged fishery allegedly endangering Māui and Hector's dolphins is "fairly traceable" to NMFS's decision to issue comparability findings (and thus the United States to continue to allow imports from those fisheries). *E.g.*, *Lujan*, 504 U.S. at 560. In a nearly 200-paragraph complaint, MHDD appears to dedicate only one statement linking actions in the United States to

actions of commercial fisheries in New Zealand: the "United States is a significant market for these fisheries." Compl. ¶ 14. MHDD does not allege that set net and trawl fisheries would not operate but for the U.S. export market, much less that the grant of a comparability finding (or denial thereof) would have any effect on commercial fishing in specified fisheries operating in the waters surrounding New Zealand.

Furthermore, if there is no way to trace particular products to bycatch, how can MHDD demonstrate that NMFS's determination "encourages," much less causes, for example, the continued use of *set nets* to catch white trevally in Fishery ID No. 1969 and not the use of Danish seines (Fishery ID No. 2035), ring nets (Fishery ID No. 1895), or purse seines (Fishery ID No. 1881) to catch the same species and export them to the United States? Alas: "we don't know." Status Conference Audio at 1:22:20-21 (Feb. 12, 2026).

MHDD also does not attempt to demonstrate that any particular fishery it challenges has resulted in bycatch of Māui or Hector's dolphins. Rather, it broadly argues that *all* set net and trawl fisheries pose a danger to the species (despite its failure to include all such fisheries in the PI Motion). *E.g.*, PI Motion at 29. The origination of the harm matters. Even MHDD recognizes that the range of the Māui and Hector's dolphins is disputed. *E.g.*, Slooten 2026 Decl. ¶ 14. MHDD also alleges that there are different subspecies of Hector's dolphins that inhabit different areas of the South Island with drastically different population levels. *Id.* ¶ 24.

Which, if any, of the challenged fisheries contribute to the bycatch that MHDD alleges is continually causing injury to its members? Yet again: "we don't know." Status Conference Audio at 1:22:20-21 (Feb. 12, 2026).

An allegation of NMFS's "encouragement" of fishing generally in New Zealand without any connection to a single specific fishery that MHDD contends contributes to its injuries cannot satisfy the causation requirement, and the complaint must be dismissed.[4]

## II.    The PI Motion Should Be Denied

### A.    The PI Motion Should Be Construed As A Petition For Writ of Mandamus

Although MHDD purports to request a preliminary injunction, its request should be construed as a petition for a writ of mandamus. The purpose of an interlocutory injunction is to preserve the status quo ante and to protect the respective rights of the parties pending a determination on the merits. *Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 863 (Fed. Cir. 1987).

MHDD does not seek to *preserve* the status quo; rather, it asks the Court to radically change the current state by imposing an indefinite ban on imports that, according to MHDD, constitute a significant portion of New Zealand's export market for fisheries. *E.g.*, Simmons 2026 Decl. ¶ 13 (asserting that a ban could affect "potentially as high as 80%" of seafood exports from New Zealand); Simmons 2020 Decl. ¶ 57 (the economic impact of an import ban could be as high as $125 million). To the extent that MHDD argues that an injunction is required because agency action has been unlawfully withheld or unreasonably delayed under § 706(1), *e.g.*, Compl. ¶¶ 185-86, "[t]he appropriate remedy is mandamus," *Purdue Pharma L.P. v. Collegium*

---

[4] On March 9, 2026, NMFS submitted to the Federal Register for public inspection notice of revised comparability findings for each of the 15 fisheries identified in MHDD's Complaint. Upon publication, these new comparability findings will supersede the 2025 Comparability Findings for those fisheries, rendering the action before this Court moot. *See* 50 C.F.R. § 216.24(h)(8)(iv); *Akiachak Native Community v. U.S. Dep't of Interior*, 827 F.3d 100, 112 (D.C. Cir. 2016) (subsequent agency action replacing a prior agency action renders moot a challenge brought against the first action under the APA); *Wyoming v. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (same); *Sea Shepherd II*, 693 F. Supp. 3d at 1367 (same). The Government anticipates that it will file a supplemental motion to dismiss for mootness at the appropriate time.

*Pharm., Inc.*, 86 F.4th 1338, 1345 (Fed. Cir. 2023). Granting mandamus in the form of an injunction is not an appropriate consideration at this preliminary stage of the litigation because it would effectively provide complete relief on the merits of MHDD's claims. *See, e.g.*, *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.").

      B.  <u>Standard of Review</u>

This Court is empowered to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). A writ of mandamus is an extraordinary remedy and is generally limited to instances in which there has been a clear abuse of power and a litigant's right to the issuance of the writ is "clear and indisputable." *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008). To prevail on a motion for a preliminary injunction, the movant must demonstrate four things: (1) that there is a likelihood of success on the merits; (2) that it will be immediately and irreparably injured absent an injunction; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardship on all the parties favors the movant. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983). "Central to the movant's burden are the likelihood of success and irreparable harm factors." *Sofamor Danek Grp. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1219 (Fed. Cir. 1996) (citation omitted).

Preliminary injunctive relief should be granted only upon a clear showing by the moving party that it is entitled to the relief requested. *Am. Inst. for Imported Steel, Inc. v. United States*, 600 F. Supp. 204, 208 (Ct. Int'l Trade 1984). At all times, the Court must be cautious to avoid

"undue judicial interference with the lawful discretion given to agencies." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009).

Whether viewed as a petition for a writ of mandamus or as a request for preliminary injunction, MHDD cannot establish its clear entitlement to the requested extraordinary relief.

C. MHDD Is Not Likely to Succeed On The Merits

1. Absent Jurisdiction, There Can Be No Likelihood of Success

As demonstrated above, this Court lacks jurisdiction over MHDD's claims. Accordingly, MHDD cannot obtain injunctive relief. *U.S. Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*, 413 F.3d 1344, 1349-50 (Fed. Cir. 2005) ("[T]he government's arguments as to jurisdiction demonstrate that the Association is not likely to succeed in this litigation.").

2. Even If The Court Concludes It Has Jurisdiction, The Relief Sought By MHDD Is Not Available

Additionally, and in the alternative, MHDD cannot demonstrate likelihood of success on the merits because the relief it seeks—an import prohibition on fish and fish products harvested in 11 New Zealand fisheries—is not a remedy available in a challenge to a final agency action.

In its *MHDD I* Remand Order, the Court correctly explained that MHDD's challenge to the 2024 Comparability Findings "concern[ed] the sufficiency of an agency's action, rather than whether the agency unlawfully withheld or unreasonably delayed action in the first instance" and was thus governed by 5 U.S.C. § 706(2), so the Court could not conclude that it was simultaneously an agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1). *MHDD I*, 799 F. Supp. 3d 1327, 1348-49 (Ct. Int'l Trade 2025). *See also In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (explaining that the purpose

of compelling agency action under § 706(1) "is to ensure that an agency does not thwart

[a court's] jurisdiction by withholding a reviewable decision").

In dicta, the Court suggested that circumstances "may merit the implementation of an

import ban going forward, if the agency continues to rely on an arbitrary and unlawful Decision

Memorandum that could be regarded as equivalent to denying a comparability finding."

*MHDD I*, 799 F. Supp. 3d at 1349. The Court's suggestion that reliance on a determination

alleged to be arbitrary or capricious can amount to a denial of a comparability finding is

not supported, despite the previous conclusion of the *Sea Shepherd I* Court.

Citing the MMPA Imports Rule, the *Sea Shepherd I* Court concluded that "in order for a

comparability finding to be 'valid' . . . the agency must not have acted arbitrarily or capriciously

in granting it." *Sea Shepherd I*, 606 F. Supp. 3d at 1325. The MMPA Imports Rule states that "it

is unlawful for any person to import, or attempt to import, into the United States for commercial

purposes any fish or fish product if such fish or fish product . . . [w]as caught or harvested in a

fishery that does not have a *valid* comparability finding in effect at the time of import." 50

C.F.R. § 216.24(h)(1)(ii)(A) (emphasis added). In reaching its conclusion, the *Sea Shepherd I*

Court relied on the ordinary dictionary definition of the term "valid" to define the term as

"legally sufficient." *Id.* But the *Sea Shepherd I* Court disregarded the use of "valid" in the

MMPA Import Rule itself, as required by binding precedent. "In all but the most unusual

situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy,

Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019)). This same rule of "statutory

construction appl[ies] when interpreting an agency regulation." *Roberto v. Dep't of the Navy*,

440 F.3d 1341, 1350 (Fed. Cir. 2006). Accordingly, "[w]hen construing a regulation or statute, it

is appropriate first to examine the regulatory language itself to determine its plain meaning." *Id.*

(using references to identical phrase in other portions of a regulation to construe phrase in jurisdictional provision).

The MMPA Import Rule explains that "a comparability finding shall remain *valid* for 4 years from publication [in the Federal Register] or for such other period as the Assistant Administrator may specify." 50 C.F.R. § 216.24(h)(8)(iv) (emphasis added). Replacing the term, as used in this subsection, with the *Sea Shepherd I* Court's preferred definition would erroneously suggest that Federal Register publication determines legal adequacy. A much more natural reading is that a comparability finding is "valid" beginning at the point of publication so long as it has not expired on its own terms or otherwise been superseded. If the *Sea Shepherd I* Court's reasoning were correct, importers and exporters would have great uncertainty about whether any products could be imported on the reliance of a comparability finding because any finding could be subject to challenge at any time. Would validity be questioned at the time of a complaint? At the time of a motion for preliminary injunction? Some later point in litigation before final judgment? The decision provides no answers.

Besides, the Court currently lacks the information to determine whether the 2025 Comparability Findings were arbitrary or capricious because it does not have the administrative record before it. *Cf.* 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (in applying an arbitrary and capricious standard of review, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").[5]

---

[5] Although the Government respectfully disagrees with the reasoning of the *Sea Shepherd I*, we note that the Court had the benefit of a complete administrative record at the time it ruled on the preliminary injunction. *See* 606 F. Supp. 3d at 1296 n.13.

26

To impose a judicial embargo would usurp the role of the agency to determine whether United States standards have been exceeded and replace the agency's deliberative determination with the independent analysis of the Court. "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). This Court's role is limited to *review* of that determination, and it "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id. Accord Nippon Steel*, 345 F.3d at 1381 (holding that this Court exceeded its authority because "[u]nder the statute, only the [agency] may find the facts and determine causation and ultimately material injury").

Congress empowered the Secretary of Commerce *and only the Secretary* (which acts through NMFS) to determine whether "commercial fishing technology . . . results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). Enjoining the importation of such products notwithstanding the agency's determination *directly to the contrary* would be equivalent to ordering NMFS to reach a predetermined result, an action not within this Court's authority. *See, e.g.*, *NEXTEEL*, 28 F.4th at 1238 (this Court "exceeded its authority by directing Commerce to reach a particular outcome"). MHDD asks the Court to exceed its authority by replacing NMFS's view with that of the Court. Doing so, particularly without having even received a record, would be error.

27

3.  MHDD Cannot Demonstrate That The 2025 Comparability Findings Are Arbitrary And Capricious

MHDD's arguments on the likelihood of success misunderstand and misconstrue U.S. regulation of domestic fisheries in fundamental ways. Perhaps this is unsurprising because MHDD wholly ignores the actual 2025 Decision Memorandum signed by the Assistant Administrator for NMFS. *See generally* 2025 Decision Memorandum. *See also* 50 C.F.R. § 216.3 (defining a comparability finding as "a finding by the Assistant Administrator that the harvesting nation for an export or exempt fishery has met the applicable [regulatory] conditions"). MHDD erroneously defines the *country report* for New Zealand as the "2025 Comparability Finding." PI Motion at 7 n.3. This report was attached to the 2025 Decision Memorandum and thus incorporated therein, along with the reports for approximately 140 other nations, but only contains some of the relevant agency analysis. *See* 2025 Decision Memorandum at 19; NMFS, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: New Zealand* (Aug. 29, 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/New-Zealand-final-2025-508.pdf (2025 NZ Country Report, attached as Exhibit B).

Had MHDD carefully considered the 2025 Decision Memorandum, it would have noted the iterative application process in which NMFS engaged. 2025 Decision Memorandum at 5-8. It would have also benefited from NMFS's explanation that the comparability analysis does not require regulatory programs, or even regulatory results, that are *identical* to those achieved under U.S. management of its commercial fisheries. *Id.* at 14-17 & n.31.

For each basis that MHDD asserts that a challenged fishery exceeds U.S. standards under the MMPA, there are examples of U.S. fisheries that operate under similar conditions. When foreign fisheries operate under comparable conditions with respect to marine mammal bycatch, it

cannot be said that the incidental killing and serious injury caused by the foreign fishery is in excess of U.S. standards. Having failed to even reference the agency's explanation of its treatment of domestic fisheries or how the MMPA Import Rule is to be applied in reaching comparability finding determinations, MHDD has not demonstrated a likelihood of success on the merits.

a.    Overview of U.S. Fisheries Regulations

NMFS classifies U.S. domestic commercial fisheries into three categories according to their levels of incidental marine mammal mortality and serious injury: Category I (frequent); Category II (occasional); and Category III (remote likelihood)). 2025 Decision Memorandum at 10. The latest classification of U.S. domestic fisheries was published in 2024. *See List of Fisheries*, 89 Fed. Reg. 12,257 (Dep't of Commerce Feb. 16, 2024); Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., *List of Fisheries Summary Table*, *available at* https://www.fisheries.noaa.gov/national/marine-mammal-protection/list-fisheries-summary-tables (last visited Mar. 9, 2026) (2024 List of Fisheries). The classification determination is made in reference to annual mortality and serious injury (collectively, take) of a marine mammal stock in a particular fishery, relative to that stock's potential biological removal (PBR) level. 2025 Decision Memorandum at 10 n.20. When determining annual take of particular stock, NMFS generally estimates the rate of take based on an average for the most recent five years of data to account for inter-annual variability, although the timeframe can be shorter when, for example, considering recent changes in regulations or practice. *See* NMFS, Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act (Feb. 7, 2023) (SAR Guidelines), *available at* https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf (last visited Mar. 9, 2026); 2025 Decision Memorandum at 9. Each Category I fishery is responsible, *on its own*, for the annual take of a

marine mammal stock equal to or exceeding 50 percent of PBR. 2025 Decision Memorandum at 10 n.20. Each Category II fishery is responsible for an annual take of a marine mammal stock of greater than one percent but less than 50 percent of PBR. *Id.* Finally, each Category III fishery has an annual take individually of any marine mammal stock of less than one percent, regardless of the cumulative take with other fisheries of that stock. *Id.*

Pursuant to 16 U.S.C. § 1387(f), NMFS is required to develop and implement a take reduction plan (TRP) for each marine mammal stock that interacts with a Category I or Category II fishery and for which "the level of direct human-caused mortality exceeds the potential biological removal level" or for which the species is considered, or likely to be considered, threatened with extinction under other authorities. *Id.* at 11 & n.23. These marine mammal stocks are known as a "strategic stock." *Id.* NMFS *may* develop TRPs for other marine mammal stocks that interact with a Category I fishery. *Id.*

TRPs include a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP. *See* 2025 Decision Memorandum at 11. In addition, TRPs may also recommend specific levels of monitoring for a fishery to account for any incidental mortality and serious injury of marine mammals during the course of commercial fishing. *See id.* Examples include at-sea monitoring through observers, electronic monitoring using onboard video cameras, and self-reporting of any incidental mortality and serious injury of marine mammals. *See id.* at 12. Today, among the hundreds of fisheries operating in the United States, there are currently six TRPs that cover just 22 Category II fisheries and five Category I fisheries. *See id.* at 13; *List of Fisheries*, 89 Fed. Reg. at 12,281. As NMFS explained, the progress that has been made under the MMPA for domestic fisheries management has not happened overnight.

30

2025 Decision Memorandum at 13. The regulation of U.S. commercial fisheries varies considerably and is based on the specifics of the fishery, status of the affected marine mammal stocks or species, availability of funding, data availability, the impact of the regulations on the economics of the fishery, and other factors prescribed by the MMPA. *See id.*

As NMFS explained, it undertook a highly interactive process with harvesting nations to determine whether, in comparison to these domestic regulations, foreign fisheries had incidental take of marine mammals in excess of United States standards. *Id.* at 5-8, 14-17. This analysis included an "evaluat[ion of] each harvesting nation's application for a comparability finding against a suite of regulatory conditions." *Id.* at 14. NMFS noted that "[t]he MMPA neither defines 'U.S. standards' nor does it identify any specific measures that NMFS must consider" and thus this evaluation would aim to determine "whether a harvesting nation that seeks to export fish and fish products to the United States maintains a regulatory program that is 'comparable in effectiveness' (*not identical*), to the U.S. regulatory program." *Id.* Ultimately, the agency's approach "takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own regulatory scheme governing marine mammal interactions with its commercial fisheries." *Id.* at 15.

> b. New Zealand Maintains a Regulatory Program Aimed at Achieving ZMRG and is Comparable in Effectiveness to the U.S. Program

Consistent with its statutory and regulatory mandate, NMFS evaluated the NZG's laws, regulations, and policies and concluded that they are comparable in effectiveness to the U.S. requirement to reduce the incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate goal (ZMRG).

First, NMFS explained that it relies on the TRP process under the MMPA to reduce incidental mortality and serious injury to insignificant rates approaching ZMRG. 2025 Decision

31

Memo at 11. TRP is an iterative process and NMFS must consider a variety of statutory factors when developing a TRP, including the economics of the fishery, availability of funding, and other priorities. *Id.* at 11-13.

Next, NMFS evaluated New Zealand's laws, regulations, and policies and concluded that the NZG's process for developing bycatch limits and establishment of a fishing-related mortality limit (FRML) for Maui and Hector's dolphins is comparable to establishing PBR levels for U.S. stocks. NZ Country Report at 22-23; 27-28. For example, New Zealand law requires commercial fishing regulators to reduce bycatch below the bycatch limit and secondarily to keep it as low as possible as soon as practicable or within 20 years, which is similar to the U.S. regulatory standard. *Id.* at 27. Also, the Māui and Hector's Dolphin TMP identifies several objectives, including to "ensure that dolphin deaths arising from fisheries threats do not exceed the population sustainability threshold (PST) with 95% certainty, cause localized depletion, create substantial barriers to dispersal between subpopulations, and allow localized subpopulations to recover and/or remain at or above 80% of their un-impacted status with 95% certainty." *Compare* 2025 NZ Country Report at 23-24 *with* NMFS, Harbor Porpoise Take Reduction Plan, *available at* https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-mammal-protection/harbor-porpoise-take-reduction-plan (last visited Mar. 9, 2026) ("The initial Plan achieved the immediate goal of reducing takes of harbor porpoises to levels below the [PBR]. . . .The Plan did not achieve the long-term goal of achieving a zero serious injury and mortality rate . . . . Specifically, harbor porpoise bycatch levels, rather than approaching ZMRG . . . again exceeded PBR beginning in 2004.").

Indeed, the TMP establishes a FRML for Hector's or Maui dolphins equal to a single individual within the defined Maui Dolphin Habitat Zone (MDHZ) and that any exceedance

would require the Minister for Oceans and Fisheries to respond. 2025 NZ Country Report at 25. Actions the Minister could take include, but are not limited to, prohibiting methods of fishing, such as trawl and/or set net fishing, throughout the MDHZ or in a portion of the MDHZ. *Id.* This is comparable to the U.S. system, specifically for those fisheries subject to a TRP. *Id.* at 22-23. Importantly, both fisheries management programs accord the agencies with the necessary flexibility and discretion to determine appropriate steps to further reduce bycatch and neither requires a complete closure of a fishery, even in instances where PBR is exceeded. 2025 Decision Memorandum at 11; 2025 NZ Country Report at 22-23.

MHDD is mistaken when it suggests that the *bycatch* limit in New Zealand is "one dolphin." PI Motion at 17. The overall bycatch limit that New Zealand has calculated for Māui dolphin is 0.102. 2025 NZ Country Report at 27. In any event, even if MHDD's focus on percentages of an animal caught in discussing the bycatch limit were correct, *e.g.*, PI Motion at 1, 16-19, MHDD misses the point. The FRML under the TMP, a separate standard, is a single animal. 2025 NZ Country Report at 24. Because an entire animal would be affected by any instance of take, there is no meaningful difference between a trigger of 0.10 and of one: a single verified incident of take would require automatic responses throughout the MDHZ. *Id.*

### c. The MMPA Does Not Require Closing U.S. Domestic Fisheries If They Have Not Achieved The Zero Mortality Rate Goal

The flexible, iterative framework set by the TMP, which permits NZG to respond to changing facts on the ground is comparable to the management of U.S. fisheries through the use of TRPs.

Under the U.S. regulatory program, the MMPA does not require closing U.S. domestic fisheries if they have not yet achieved the ZMRG and all Category I fisheries operate despite exceeding annual mortality and serious injury of marine mammal stock of at least 50 percent of

PBR. *E.g.*, *List of Fisheries*, 89 Fed. Reg. at 12,257. According to the latest published list, there are currently ten Category I fisheries, but only half of those are subject to a TRP. *Compare id.* at 12,268-69, 12,274-75 *with id.* at 12,281 (five total Category I fisheries covered by TRPs).

MHDD argues, PI Motion at 15-16, that the 2025 Comparability Findings are arbitrary and capricious because New Zealand's fisheries operate despite not meeting the ZMRG for Māui dolphins. Putting aside whether MHDD correctly interprets New Zealand policy or has demonstrated that ZMRG has, in fact, not been met, closure of fisheries in such circumstances is not the U.S. standard under the MMPA. U.S. domestic fisheries operate pursuant to a TRP even in instances where they have difficulty achieving the ZMRG according to the MMPA's prescribed procedures and timelines. As NMFS explained, ZMRG is ultimately a goal that commercial fisheries should approach, even if it is not reached. NMFS 2025 Decision Memo at 11 & n.24 (quoting H.R. Rep. No. 92-1488, at 23 (1972) (Conf. Rep.): "[i]t may never be possible to achieve this goal, human fallibility being what it is, but the objective remains clear"). *See also* MMPA Imports Rules, 81 Fed. Reg. at 54,398 ("[NMFS] has prioritized reducing bycatch to sustainable levels (*e.g.* below the bycatch limit) and will consider the application of the ZMRG . . . to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met ZMRG"). For example, the Mid-Atlantic Gillnet Fishery and the Northeast Sink Gillnet Fishery are subject to a TRP due to their take of harbor porpoise. *See List of Fisheries*, 89 Fed. Reg. at 12,281. The TRP, which is codified at 50 C.F.R. § 229.33, places certain restrictions on these two fisheries and, despite being in place since 1998, has not yet achieved the ZMRG. *See* Harbor Porpoise Take Reduction Plan. In addition, the fisheries subject to the Atlantic Large Whale TRP have also been regulated for

close to three decades and those fisheries have continued to operate while NMFS works through the iterative process to achieve ZMRG. *See* NZ Country Report at 29.

The record before NMFS does not suggest that *any* of the fisheries identified in the PI Motion currently contribute to annual take in excess of the Māui dolphin bycatch limit estimate of 0.10. NZ Country Report at 27-28 (estimated annual bycatch of Māui dolphins, including cryptic mortality, is 0.056).  Indeed, the last known Māui dolphin bycatch in New Zealand fisheries occurred in 2002 and the last known bycatch of any *Cephalorhynchus* species was in 2012, *id.* at 30, approximately eight years before the NZG developed the TMP that currently manages fisheries interacting with Māui and Hector's dolphins.

> d.   The Negligible Impact Standard Is Only Relevant When A Fishery Seeks An Affirmative License to Take Marine Mammals

MHDD also mischaracterizes, PI Motion at 15, the purpose of the negligible impact standard. The MMPA instructs the Secretary of Commerce to "*allow* the incidental, but not intentional, taking by persons" with a valid fishing permit of "marine mammals from a species or stock designated as depleted because of its listing as an endangered species or threatened species under the Endangered Species Act of 1973," but only after a determination that, among other things, "the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(E)(i) (emphasis added). In other words, it is an *affirmative license* to incidentally take vulnerable marine mammals in connection with commercial fishing activities. 2025 Decision Memorandum at 10, 17.

Despite MHDD's suggestion, PI Motion at 16, the negligible impact standard is *not* applicable to NMFS's comparability findings for New Zealand's commercial fisheries. Unlike the United States, New Zealand does not affirmatively authorize its commercial fisheries to take marine mammals incidental to commercial fishing operations. Rather, a fisher may present

evidence that marine mammal take was incidental to fishing *as a defense* under certain conditions. *See* Response to Comparability Finding Application Part D: Q1 at NMFS_001146, 2024 Proceedings (Feb. 13, 2025), ECF No. 15-2 (attached as Exhibit C). This is categorically different than the NZG affirmatively authorizing the take of marine mammals incidental to its fisheries, as is permitted under § 1371(a)(5)(E).

   e. Monitoring of Commercial Fisheries In New Zealand Is Comparable to U.S. Monitoring

   All 11 of the fisheries challenged in the PI Motion are subject to monitoring. 2025 NZ Country Report at 1 ("All of New Zealand's export fisheries have a monitoring program."). This includes self-reporting through logbooks, an observer program for most fisheries, and for Fishery ID Nos. 1969 and 1977, additional electronic monitoring. *Id.* at 3. Most U.S. fisheries are Category III, which are not required to have human or electronic observers. 2025 Decision Memo at 13 n.29; *List of Fisheries*, 89 Fed. Reg. at 12,258. For other fisheries, NMFS makes monitoring determinations on a fishery-by-fishery basis. 2025 NZ Country Report at 18. For example, NMFS requires high (in some cases, 100 percent) observer coverage when monitoring data are needed to estimate protected species bycatch, make in-season management decisions, close fisheries when bycatch limits are exceeded, or ensure regulatory compliance. *Id.* In other cases, monitoring may be as low as 10 percent or not required at all. 2025 NZ Country Report at 18. When a monitoring program is expected to last one year or less and PBR is small (less than one), NMFS would aim for 80 percent coverage but would consider lower rates to be effective depending on the length of the monitoring program. *Id.* The United Staes generally does not rely on electronic monitoring programs. *Id.* at 21. Specific levels of monitoring are typically identified for fisheries in which there is a TRP in place. 2025 Decision Memorandum at 12.

NMFS determined that New Zealand, on the other hand, has attained 90 percent monitoring coverage within the Māui dolphin habitat, well exceeding the observer coverage in the United States, as explained by NMFS. *Id.* at 21. Besides, there has been no known incident of Māui dolphin bycatch since 2002 and the last known bycatch of a *Cephalorhynchus* species was in 2012, 2025 NZ Country Report at 30, and MHDD provides no basis to conclude that *any* of the challenged fisheries have exceeded the bycatch limit for Māui dolphins from the challenged set net and trawl fisheries, *id.* at 28 (estimated annual bycatch for Māui dolphins of 0.056). This is especially true for the South Island fisheries, where there are no allegations that fisheries could interact with Māui dolphins. *See, e.g.*, Slooten 2026 Decl. ¶ 14 (explaining that the Māui dolphins' range is along the North Island, West Coast).

f.    MHDD Does Not Explain How A Different Population Estimate Or Bycatch Determination Would Alter NMFS's Analysis

MHDD argues, PI Motion at 21-22, that NMFS relied on outdated or incorrect population estimates to calculate PBR of Māui dolphins. MHDD is incorrect. NMFS relied on New Zealand's most recent estimate of 54 Maui dolphins to inform the bycatch limits. 2025 NZ Country Report, at 16-17. And MHDD does not explain how the difference in PBR would affect the analysis for any particular fishery. As explained above, NMFS determines how to classify, and thus regulate, domestic fisheries on a fishery-by-fishery basis. It also makes fishery-specific comparability findings. But the evidence presented to NMFS indicates that there has been no known bycatch of Māui dolphins, or any other a *Cephalorhynchus* species, MDHZ since at least 2012. 2025 NZ Country Report at 30. Accordingly, the PBR level has not been exceeded. Under the U.S. program, "species or stocks are generally removed from the list of marine mammal species and/or stocks incidentally killed or injured if no interactions are documented in the 5-

year timeframe summarized in that year's [list of fisheries]." *List of Fisheries*, 89 Fed. Reg. at 12,258.

Likewise, MHDD argues, PI Motion at 23-24, that the bycatch rate calculated by NMFS is arbitrary, but fails to explain how a higher bycatch rate would change any analysis. If MHDD is correct about bycatch rates, then U.S. law would, at most, require a domestic fishery with a comparable rate of bycatch to address bycatch exceedances through the TRP process. New Zealand has already crafted the TMP, a similar iterative process that addresses the risks to Māui and Hector's dolphins from set net and trawl fisheries. As indicated above, the applicable framework would require the NZG to take appropriate action to address the bycatch of a single Māui dolphin. *See* 2025 NZ Country Report at 25. Similarly, even when PBR is exceeded—for which there is no evidence of occurring for Māui dolphins—U.S. domestic fisheries subject to a TRP are *not* automatically closed and would be re-evaluated to determine how best to reduce bycatch rates further. *See* 2025 NZ Country Report at 23 ("Typically, when PBR is exceeded, NMFS will reconvene the Take Reduction Team to explore whether additional regulatory measures exist to further reduce bycatch below PBR again. . . . NMFS has not closed a fishery under this regulatory review process when bycatch of a marine mammal stock exceeds PBR.").

In any event, NMFS explained that, based on the closures and reductions implemented since the 2020 regulatory updates, "New Zealand estimates that Māui dolphin bycatch is substantially lower than the bycatch limit because the areas where fishing can occur are outside the core area of Māui dolphin distribution and present a low risk of Māui dolphin capture." 2025 NZ Country Report at 25. MHDD's mere disagreement with how NMFS weighed the evidence before it is not enough to reverse an agency's action under the APA. *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938).

> g. The Record Evidence Demonstrates The Bycatch of Hector's Dolphins Is Not In Excess of U.S. Standards

Finally, MHDD is incorrect that the record evidence does not support NMFS's determinations with respect to South Island set net and trawl fisheries. PI Motion at 26-27. MHDD has not reviewed the administrative record, and neither has this Court. However, the record evidence provided by the NZG demonstrates that, of the fisheries challenged by MHDD, only the following had any reported take of Hector's dolphins: Fishery ID Nos. 1978 (average annual take of 3.6); 2046 (average annual take of 0.3); 2047 (average annual take of 9.7); 2051 (average annual take of 1.9); 2052 (average annual take of 1.8); 2077 (average annual take of 1.4). *See* Exhibit D (IAICRS database excerpts).[6] The bycatch limit NMFS calculated for Hector's dolphins, which is equal to PBR, is 66.5. None of these fisheries come anywhere close to exceeding this limit. And only Fishery ID Nos. 1978, 2047, 2051, 2052, and 2077 exceed one percent of PBR for Hector's dolphins.

Contrary to MHDD's arguments, PI Motion at 25, NMFS provided ample analysis for the mitigation measures New Zealand takes to protect Hector's dolphins. NMFS explained that Hector's dolphins are considered a strategic stock under 16 U.S.C. § 1387(f)(3). 2025 NZ Country Report at 13. It also summarized the extensive measures that New Zealand takes to

---

[6] NMFS explained that New Zealand provided information in NMFS's "IAICRS database, which identified among other things, marine mammal stocks, their range, fishing gear type, total estimated average annual mortality, population abundance, bycatch limits, and when stock assessments had been conducted, and when future assessments might be conducted." 2025 NZ Country Report at 12.

protect such stock in the challenged fisheries. *Id.* at 5-12. For Fishery ID Nos. 1978, 2047, 2051, 2052, and 2077 the measures include:

|  | 1978 | 2047 | 2051 | 2052 | 2077 |
|---|---|---|---|---|---|
| Time/area closure | x | x | x |  | x |
| MPA/fishing closures | x | x | x | x | x |
| Deterrent devices (pingers, etc.) | x | x | x |  |  |
| Fishing practices (move on, net tending, soak time, etc.) |  | x | x |  | x |
| Safe handling and release practices | x | x | x | x | x |
| Marine mammal ID guides | x | x | x | x | x |
| Avoid areas of high activity, rookeries, or foraging areas | x | x | x | x | x |
| Practice good offal management |  |  |  | x | x |
| Gear Operational Procedures | x | x | x | x |  |

*Id.* NMFS also explained the types of similar mitigation measures that would be required under a TRP. 2025 Decision Memo at 11. Finally, NMFS acknowledged that the TMP provides broad mitigation measures, including closures in some instances. 2025 NZ Country Report at 13.

Even assuming MHDD's conjecture about the incidence of take for any of these fisheries were correct, the comparable step that would be taken under U.S. standards is the establishment of a TRP. *See* 2025 Decision Memorandum at 11-12. MHDD grumbles about the calculation of bycatch limits but does not explain how the above mitigation measures or the provisions of the TMP more generally are not comparable to what may be required by § 1387(f). Because the NZG is already undertaking all that would be required under the U.S. regulatory regime, MHDD's argument on the South Island fisheries lacks merit.

### D.  MHDD Cannot Show That It Will Be Immediately And Irreparably Injured Absent Injunctive Relief

Assuming for the sake of argument that the aesthetic, recreational, and other interests of MHDD's members are injured by the 11 fisheries identified in its PI Motion despite *any* specific allegations, MHDD cannot show that it would *avoid* injury through preliminary injunctive relief, so it cannot demonstrate it will be harmed in its absence. As MHDD's counsel has conceded,

"we don't know" what, if anything the NZG might to regulate its fisheries to ameliorate harm to Māui and Hector's dolphins. Status Conference Audio at 1:22:20-21 (Feb. 12, 2026). Of course, we do know what MHDD alleges the NZG did to further regulate fisheries in response to the *Sea Shepherd I* injunction: nothing at all. Slooten 2026 Decl. ¶ 41; Rose 2026 Decl. ¶ 65. *See also* Status Conference Audio at 1:31:37-48 (Feb. 12, 2026) (statement of counsel for NZG: "All I know is what they did [in response to the *Sea Shepherd I* injunction], which is they stood by what they had done. They believed it was supported by the science, not by opinion."). Any other conclusion now would be nothing other than conjecture. *Id.* at 1:32:57-1:33:10 (statement of counsel for NZG: "But again, I can't speculate if NZG might do anything. The notion that they might impose more fishing restrictions, that's just pure speculation. There is just no way to know.").

Further, even if the NZG committed to taking certain steps beyond the current commercial fisheries management framework—and it has not—regulatory, policy, or other legal change in New Zealand, like in the United States requires certain procedural steps to go into effect. *See* Taylor Decl. ¶¶ 5, 8-12. Any change must be consistent with internal New Zealand law and its international treaty obligations. *Id.* ¶¶ 2-3. "Reconsideration of regulatory measures previously put in place to address risk to Hector's and Māui dolphins would require NZG to meet several statutory requirements. These reviews involve a few phases – research and analysis, pre-engagement and development of consultation material, formal consultation, submission analysis and development of advice, Ministerial decision-making and Parliamentary legislative processes." *Id.* ¶ 8. The NZG must engage in a public consultation process with interested parties, including those with fishing, environmental, commercial, and recreational interests, as well as specific groups from indigenous communities. *Id.* ¶¶ 10-11. These steps evidently take

time. MHDD's challenge to the 2024 Comparability Findings was decided on the merits within approximately eight months. In contrast, it took the NZG approximately two and a half years to finalize the TMP from the initial research and analysis stage through the various stages of pre-engagement, consultation, advice, decisionmaking, and legislative processes. *Id.* ¶ 8. Further, NZG is restricted by law in what in can consider before modifying current fisheries management, which is explicitly limited to "ensuring fishing activity does not constitute a risk to sustainability and long-term viability of marine mammal populations." *Id.* ¶ 3. "An import ban or a change to the current level of export market access does not constitute a risk to sustainability." *Id.* ¶ 4.

MHDD has not, and cannot, demonstrate that these steps would be completed before this case were decided on the merits, assuming a normal briefing schedule. If it is not legally feasible for the NZG to pass and implement whatever additional regulations of the set net and trawl fisheries that MHDD maintains is required to remedy the purported injury to the aesthetic and other interests of its members in the time it takes for the Court to resolve the merits in this action, then MHDD would be no better or worse than it is now, irrespective of any injunctive relief.

E. The Public Interest Would Not Be Better Served By An Injunction And The Balance Of Hardships Favor the Government

When the Government is a party, the last two factors of the test for injunction are merged. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). MHDD proposes that this Court disrupt tens, if not hundreds, of millions of dollars in trade with no apparent benefit to the aesthetic and other interests of its members. Simmons 2020 Decl. ¶ 57. As MHDD's counsel would say, "we don't know," Status Conference Audio at 1:22:20-21 (Feb. 12, 2026), what damage that would cause numerous third parties because those parties, including commercial fishers, U.S. importers, and other affected communities, are not before this Court.

A Court-imposed import prohibition, on the other hand, would cause damage to the Government as it would interfere with the Executive Branch's ability to engage in foreign affairs, with likely negative ramifications for vulnerable marine mammal species. Among other things, the MMPA Imports Rule requires NMFS to consider both the established and *likely* progress of a harvesting nation's regulatory efforts. 50 C.F.R. § 216.24(h)(7)(iii). The MMPA and the Rule also authorize NMFS to provide technical assistance to assist harvesting nations to develop fisheries management consistent with the MMPA and negotiate, through the Secretary of State, agreements with harvesting nations to reduce marine mammal take caused by commercial fishing operations. *Id.* § 216.24(h)(11); 16 U.S.C. § 1378. Inherent in these actions is the discretion to determine the types of commitments harvesting nations could make to be consistent with the MMPA. Retaining that discretion over foreign policy objectives is precisely why the type of lawsuit brought by MHDD is not thought to be traditionally redressable through the judicial process. *See United States v. Texas*, 599 U.S. 670, 679-81 (2023) (holding that states lacked standing to challenge immigration enforcement policies when, among other things, such policies implicate foreign policy).

This interference with foreign policy objectives occurred in the *Ross* litigation. In a 2018 letter, the then-Ambassador to the United States from Mexico, Gerónimo Gutiérrez Fernández, explained that the preliminary injunction imposed by the *Ross* Court had disrupted "sensitive consultations" between the United States and Mexico and that the "embargo ordered by the Court . . . threaten[ed] to disrupt the implementation of the extensive Vaquita-protective measures Mexico has put in place by diverting critical government resources to the implementation of the embargo nationwide," potentially resulting in "significant socio-political and economic impacts that might adversely affect the ability of the Mexican Government to

continue the implementation of important actions of the existing Comprehensive Program." Letter from the Ambassador of Mexico to NMFS, *Natural Resources Defense Council v. Ross*, Case No. 18-55 (Aug. 24, 2018), ECF No. 43-2. The *Ross* Court simply ignored this evidence of the negative impact of *judicial* interference in foreign relations. *See generally Natural Resources Defense Council v. Ross*, 348 F. Supp. 3d 1306 (Ct. Int'l Trade 2018).

With the benefit of hindsight and nearly eight years of an import prohibition, we do know the tragic result for the vaquita following the judicial disruptions of these consultations, as the *Ross* plaintiffs have publicly stated: "Mexico's unwillingness to enforce its own wildlife protection and trade laws is driving the extinction of the critically endangered vaquita porpoise." *North American Environmental Commission Confirms Mexico's Role in Imperiling Vaquita*.

Accordingly, the public interest and balance of equities weighs against a Court-imposed embargo with the potential to disrupt hundreds of millions of dollars in trade and, as history has shown, to cause lasting damage to the foreign relations of the United States, including to achieve the objectives of the MMPA, when "we don't know" what, if any, benefit it may have on the aesthetic or other interests of MHDD and its members. Status Conference Audio at 1:22:20-21 (Feb. 12, 2026).

III.    <u>MHDD Is Required To Pay Security Before Obtaining Injunctive Relief</u>

Finally, this Court's Rules require that a preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." USCIT R. 65(c). In addition to the tens, if not hundreds, of millions of dollars of trade MHDD seeks to halt in favor of their member's aesthetic and other interests, enforcing an embargo under the MMPA places a significant burden on the United States to administer certificates of admissibility. Declaration of Virginia McPherson ¶ 4 (estimating costs to the U.S. Customs and

Border Protection to administer a 12-month import ban of the 11 fisheries identified in the PI

Motion) (attached as Exhibit E). Further, MHDD's own expert suggests that the NZG would be

forced to spend significant time and resources to ensure that products *not* covered by a Court-

ordered embargo would be permitted to enter the United States. Simmons 2020 Decl. ¶ 57. *See*

*also* Taylor Decl. ¶ 25 (estimating costs to the NZG of $120,000 or more based on experience

with *Sea Shepherd I* embargo). Absent security, these costs cannot be recovered if the United

States is found to have been wrongfully enjoined.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss the complaint for lack of

jurisdiction or, in the alternative, deny the PI Motion.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

OF COUNSEL:                                    PATRICIA M. MCCARTHY
MARK HODOR                                     Director
Office of the General Counsel
National Oceanic & Atmospheric Administration

ZACHARY SCOTT SIMMONS                          /s/Agatha Koprowski
Office of the Chief Counsel                     AGATHA KOPROWSKI
U.S. Customs and Border Protection             Trial Attorney
                                               U.S. Department of Justice Civil Division
                                               P.O. Box 480, Ben Franklin Station
DANIEL PAISLEY                                 Washington, D.C. 20044
Office of the General Counsel                  Tel: (202) 507-6081
Department of the Treasury                     Fax: (202) 353-0461
                                               Email: agatha.koprowski@usdoj.gov

March 9, 2026                                  *Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1) contains 13,866 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski